408 S.E.2d 274

The **COMMITTEE ON LEGAL ETHICS OF THE WEST VIRGINIA STATE BAR, Complainant,**

v.

Michael C. **FARBER, Respondent.**

No. 19909.

Supreme Court of Appeals of West Virginia.

Submitted June 4, 1991.

Decided June 27, 1991.

Rehearing Denied Sept. 5, 1991.

---

Sherri D. Goodman, Charleston, for complainant.

Robert Bastress, and Franklin Cleckley, Morgantown, for respondent.

NEELY, Justice:

This is a disciplinary proceeding instituted by the Committee on Legal Ethics of the West Virginia State Bar against Michael C. Farber, a member of the Bar. The Com-

mittee found the respondent guilty of three separate counts of misconduct.

The Committee did not number their charges in the most logical order, but, reviewed logically, they are as follows. Count II charged the respondent with misrepresenting facts in both a motion to disqualify a circuit judge and in allegations against that judge made to a special prosecutor. Count IV charged respondent with falsely accusing a circuit judge of criminal acts. Count I charged respondent with engaging in a pattern and practice of contemptuous and disruptive behavior consisting of misrepresentations of fact and reckless and false accusations of criminal activity similar to those specifically charged in Counts II and IV. The Committee found respondent guilty on the three counts.

With respect to Count II, the misrepresentations of fact, the Committee asks that we publicly reprimand the respondent. With respect to Count I, the pattern and practice of misconduct, the Committee asks that we order that respondent not be reinstated until psychologically evaluated, and that we suspend his license for one year to run concurrently with a one year suspension for Count IV. The Committee also requests costs. Upon a thorough examination of the record, we find the Committee's decision that respondent is guilty on Counts II, IV, and I, to be amply supported.

■ We award the Committee its costs in the amount of $10,189.92. As for discipline, we depart from the recommendation of the committee. As we said in Syllabus Point 3 of *Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984):

"This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law."

Because of the peculiar nature of this case, we find that it would be inappropriate to attach specific discipline to each separate count. First, for most of respondent's misdeeds, it could be said that each one standing alone is not terribly diabolical, but together they clearly show respondent to be currently unfit to practice law. Second, respondent's misbehavior may spring more from some mental disorder than from cold dishonesty or malevolence. Third, respondent should have been taught that there are ethical bounds to zealous advocacy much earlier than today. For these reasons then, we impose less severe sanctions than the Committee has requested, but sanctions that provide safeguards to prevent further misconduct by respondent.

■ We order that respondent be publicly reprimanded and that his law license be suspended for three months. However, because respondent's course of conduct convinces us that respondent may have emotional problems that adversely affect his ability to practice law, we order that he not be reinstated until he has been examined by a psychiatrist of the State Bar's selection who indicates that respondent comprehends the nature of the transgressions that led to this proceeding and that respondent has undertaken steps to remedy any emotional or psychological problem or problems that may have contributed to the course of conduct for which he is being disciplined. In addition, we condition Mr. Farber's readmission to the bar upon his finding a supervising lawyer acceptable to the State Bar who agrees to supervise his practice for two years to protect the public from possible reoccurrences of the behavior discussed below. *See Blair, supra.*

■ When a lawyer has been disbarred for a disciplinary violation, we will often allow him to be readmitted after five years of good behavior, provided that he shows that he is rehabilitated. Likewise, when we suspend a lawyer for disciplinary violation(s), we may require that the lawyer provide proof of rehabilitation before being readmitted to practice. Syllabus Point 1 of *In Re Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980), states:

"The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to re-

sume the practice of law. To overcome the adverse effect on the previous disbarment he must demonstrate a record of rehabilitation. In addition, the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration."

How do we determine whether a lawyer is rehabilitated? Syllabus Point 2 of *In Re Brown, supra,* states:

"Rehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law he will engage in unprofessional conduct."

In this case, three months will not give respondent the opportunity to develop a new "course of conduct" by which the State Bar can judge his fitness. Thus, we merely order that respondent not be readmitted to practice law in West Virginia until he provides satisfactory proof to the State Bar that he has taken *reasonable steps* to alleviate the mental or emotional problems that have impaired his ability to practice law in an ethical and reasonable manner.

The record shows respondent to be bright and articulate. Thus it is our hope that respondent will take this opportunity to learn that there are bounds to zealous advocacy, and will then return to a fulfilling and ethically sound law practice. If respondent uses his three months well, it is conceivable that he will be readmitted at the end of three months. On the other hand, if respondent chooses not to take steps to make himself fit to practice, or forever refuses to furnish proof through a psychiatrist selected by the bar that he has undergone appropriate counseling and self-analysis to gain insight into and modify his day-to-day behavior, he may *never* be readmitted to practice in this State. As one found in civil contempt always holds the key to his cell in his own pocket, respon-

dent here holds the key to his future as a lawyer.

### I.

### Misrepresentations in the Braxton County Taxpayer Suit

(Count II of Committee Complaint)

In December 1984, the Braxton County Commission bought an office building from John Thomas, remodeled it and used it for the Office of the Prosecuting Attorney. Certain taxpayers believed that the price paid for the Thomas Building was excessive, and that the deal was kept from the public to avoid objections to the purchase before it took place. The taxpayer group, led by Rogers Cunningham, hired Ernest Morton, Jr., a respected lawyer of Braxton County, to represent them, and Mr. Morton assigned the case to respondent, an associate in Mr. Morton's firm.

In the taxpayer's suit, *Cunningham, et al., v. County Commission of Braxton County, et al.,* Civil Action No. 85–C–43, plaintiffs' complaint alleged that the County Commission violated various statutes in their purchase and renovation of the Thomas Building, and also alleged that the Prosecuting Attorney, James W. Douglas, refused to prosecute the Commissioners because his office and private law practice were located in the Thomas Building.

Trial was scheduled for 24 June 1985, and pretrial discovery showed that Mr. Douglas and Mr. Thomas routinely attended WVU football games together. On one occasion in 1984, one of the Braxton County Commissioners, Lewis Wine, went with them to a game. Mr. Douglas testified in a deposition that he did not discuss the purchase of the building with Mr. Wine on that occasion.

However, at some time before trial, Mr. Cunningham had a chance conversation with a lawyer from Clay County, Richard Facemire, who said that he had spoken with Mr. Douglas about the Thomas Building before the Commission bought it. Mr. Douglas told Mr. Facemire that the Commission was considering buying the building, and that he, Mr. Douglas, wanted to

locate the Prosecuting Attorney's office there. Mr. Cunningham told respondent about the conversation with Mr. Facemire, and respondent called Mr. Facemire to ask him about the same conversation.

Mr. Facemire told respondent he could not remember where the conversation took place, whether at a WVU football game, or at Mr. Douglas' office when Mr. Facemire had interviewed for a position as an assistant prosecutor. He told respondent that he did recall having a conversation with Mr. Douglas in the snack area at a WVU football game, and that during that discussion, Mr. Douglas had introduced him to Mr. Thomas, whom he already knew, and a certain Reverend Mr. Hambel, whom he did not know. However, Mr. Facemire did not remember which football game they were attending when all this occurred.

Respondent specifically asked Mr. Facemire whether he had met Commissioner Wine at the same game. Mr. Facemire responded that he did not know if Commissioner Wine was at the game, because he had not yet been introduced to Commissioner Wine, and did not know what he looked like.

The taxpayers' action was tried before Judge Sommerville on 24, 25, and 26 June 1985, but respondent never called Mr. Facemire as a witness. On 1 August 1985, Judge Sommerville found in favor of the Commissioners, and also refused to appoint a special prosecutor. On 17 September 1985, respondent moved the Court to reconsider the Court's order, and on the same day filed a motion to disqualify Judge Sommerville with respect to the motion to appoint a special prosecutor, on the grounds of a dispute between the Judge and the Prosecutor concerning a collateral matter.

In the motion to disqualify, respondent recounted the prosecutor's testimony to the effect that he had not discussed the purchase of the Thomas Building with Commissioner Wine. The motion then went on:

C. Since the filing of the complaint in this matter, the plaintiffs have been informed by Richard Facemire, now the Prosecuting Attorney of Clay County, West Virginia, that he also attended the Syracuse game at Mountaineer Field on October 12, 1984 and at that time he *had occasion to be introduced to Mr. Thomas and Commissioner Wine.* According to Mr. Facemire, Mr. Douglas brought up the subject of the purchase of the Thomas property by the Braxton County Commission and further explained to Mr. Facemire that the building was under consideration for use as offices for the prosecuting attorney of Braxton County, West Virginia. [Emphasis added.]

Respondent contended that a special prosecutor needed to be appointed to determine whether the Prosecuting Attorney had sworn falsely in light of, "the deposition and trial testimony of William Martin, Lewis Wine, John Thomas, *and the statements made to plaintiffs' counsel [respondent] by Mr. Richard Facemire."* [Emphasis added.]

Pursuant to Trial Court Rule 17, respondent filed, along with the motion to disqualify the circuit judge, an affidavit signed by respondent stating:

That the attached Motion to Disqualify is made *in good faith* and that there are *ample facts of record to support the allegations set forth therein* to warrant the limited disqualification of the presiding judge and thereafter, the appointment of a special prosecutor. [Emphasis added.]

It appears certain that respondent knew when he filed the motion that Mr. Facemire could not testify to the facts that respondent claimed that Mr. Facemire had told him. Thus, respondent deliberately misrepresented facts in order to lend support to his accusations of wrongdoing by the prosecutor and the county commission.

Respondent's motion achieved the result he desired, for, on 27 September 1985, Judge Sommerville recused himself from hearing the request for appointment of a special prosecutor.

Within several months, Charles King was appointed special prosecutor. On 9 May 1986, respondent mailed to the special prosecutor a document entitled "Allegations of Criminal Conduct," in which respondent asserted that Mr. Douglas, the prosecuting

attorney, had given false testimony in a deposition. Among other things, respondent accused the prosecutor of falsely denying having had a conversation with Mr. Facemire at the game relating to the Thomas property. In this document, respondent took phrases from a deposition by Mr. Facemire, and combined them into a sentence which he placed in a block quotation, the pertinent part of which was:

James Wilson Douglas indicated to me ... at the West Virginia University game where Reverend Charles Hambel and I were in attendance that he had heard rumors or speculations that the Braxton County Commission was considering the purchase of the Thomas property for additional office space for the county.

There are several problems with the block quote given above. First, it is not a quote, but a misleading paraphrase. Second, respondent deliberately edited out of his rendition of Mr. Facemire's affidavit evidence that would have detracted from respondent's allegations. Respondent submitted Mr. Facemire's affidavit along with the "Allegations."

In the affidavit, Mr. Facemire recalled speaking with Mr. Douglas at *one of* the early WVU football games, and being introduced to the Reverend Mr. Hambel, a Sutton Baptist Minister, as well as Mr. Thomas. He specifically stated, however, that he did *not* see and was not introduced to County Commissioner Wine, but respondent chose to edit this crucial point out of his "quotation," because that would have detracted from his earlier assertion that County Commissioner Wine was part of the outing as well. Mr. Facemire also stated that he spoke with Mr. Douglas at only one football game in early fall of 1984, but that he also met with Mr. Douglas at the latter's office at least once, and maybe twice between September 1984 and December 1984, and also spoke with him over the telephone at least twice during the same period.

Mr. Facemire recalled that on one of the occasions when he met prosecutor Douglas in person, they discussed the Thomas property:

"James Wilson Douglas indicated to me that he had heard rumors or speculations that the Braxton County Commission was considering the purchase of the Thomas property for additional office space for the county.

Mr. Douglas explained why he wanted the County to buy the building for the prosecuting attorney's office. Mr. Facemire specifically stated in his affidavit:

6. That I am unable to say with certainty whether the above referenced conversation did or did not occur during that particular West Virginia University Football Game where I had spoken with James Wilson Douglas (or if it occurred at a later conversation with James Wilson Douglas). However to the best of my memory and recollection, I believe that the above conversation may have taken place at the particular West Virginia University Football Game where Reverend Charles Hambel and I were in attendance.

Obviously, the quotation that respondent used conveyed a different message from the actual substance of Mr. Facemire's affidavit, and conveyed certain points with much more certainty than Mr. Facemire had demonstrated in the affidavit. If respondent had *paraphrased* Mr. Facemire's statements, the seriousness of the misrepresentation would have been comparatively small. The reader, recognizing the subjectivity inherent in a paraphrase would have been led to confirm that the affidavit meant what respondent said it meant. However, respondent paraphrased the affidavit, editing out the parts he did not find helpful to his cause, and then represented his paraphrase as verbatim testimony. That is completely unacceptable behavior.

The error itself might be forgivable as sloppy work on the part of a relatively young and overzealous lawyer. However, respondent refuses to acknowledge that he violated any disciplinary rules, and has testified that *as long as he attached the original affidavit from which he quoted, no misrepresentation existed.* Respondent

appears to view the practice of law as a game without any rules and seems to think that he can lie to a judge as long as the judge has the material with which to catch him in his lie.

Thus we agree with the Committee that respondent's conduct violated Disciplinary Rules 1–102(A)(4), 1–102(A)(5), and 7–102(A)(5), which provide:

DR 1–102 Misconduct—(A) A lawyer shall not:

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

DR 7–102 Representing a Client Within the Bounds of the Law.—(A) In his representation of a client, a lawyer shall not:

(5) Knowingly make a false statement of law or fact.

■ While "ethical considerations" listed in the *Code of Professional Responsibility* are often more advisory than mandatory, the disciplinary rules are decidedly mandatory. We said in Syllabus Point 3 of *Com. on Legal Ethics of W. Va. v. Tatterson,* 173 W.Va. 612, 319 S.E.2d 381 (1984):

"The Disciplinary Rules of the Code of Professional Responsibility state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action."

Misrepresenting a paraphrase as a quotation can be highly prejudicial to the proper administration of justice. As a practical matter, judges, particularly trial judges, cannot read and verify every word on every scrap of paper that is put before them, and if a brief or motion contains a quotation, that quotation must be accurate.[1] If today's legal system is to work at all, a judge must be able to take a quotation as a quotation. We recognize that lawyers will choose their quotations carefully. However, to select carefully various words and phrases from an affidavit, and assemble them into a block "quotation" is seriously to misrepresent the substance of the affidavit. Respondent's opinion that a misrepresentation is not wrong if the judge has a means of learning of its falsity is just one aspect of respondent's distorted view of legal ethics.

II.

### Reckless Accusations Against Judge Strickler

#### (The Committee's Count IV)

On 4 March 1982, the "Rebel Shelter" tavern in Nicholas County was burned. One year later, in March of 1983, the Nicholas County Sheriff and one of his friends drove a man into the countryside and severely beat him. The victim gave a statement to the Nicholas County prosecutor, Larry Losch, who had heard rumors that the sheriff was involved in the burning of the Rebel Shelter. At Mr. Losch's request, State Police Trooper C.E. Shelton began investigating the beating and the Rebel Shelter arson.

Later, two deputies confessed to their involvement in the arson of the Rebel Shelter, and implicated the sheriff. One state police trooper testified that he had picked up some of the chemicals used in the arson from a drugstore, but did not realize for what purpose they were to be used. Officer Shelton completed the report of his investigation on 17 May 1983. His report has come to be known as the "Shelton Report."

In April 1983, the sheriff was indicted in Nicholas County for malicious wounding of the victim of the beating discussed above. In May 1983, pursuant to a plea agreement, the sheriff pled guilty to aiding and abetting an unlawful assault, and resigned as sheriff. The plea agreement provided that the sheriff would not be prosecuted further for any matters within the prosecutor's knowledge. The Rebel Shelter arson was within the prosecutor's knowledge.

The judge of the Circuit Court of Nicholas County, Elmer D. Strickler, was unaware of the plea agreement, and granted the sheriff's motion to change the venue to

---

1. We recognize that typographical errors or inadvertent misquotation will occur, but respondent has made it clear that his misrepresentations do not spring from these causes.

Putnam County. Judge James Holliday of Putnam County then required that the plea agreement be modified to make it clear that the promise not to prosecute bound only the Nicholas County Prosecutor, Mr. Losch. Judge Holliday reviewed the Shelton Report before sentencing the sheriff on 27 October 1983. Judge Holliday sent a copy of the Shelton Report to Judge Strickler to alert him to criminal activity within his circuit.

After the sheriff had entered into the plea agreement in July 1983, the owner of the burned tavern, Mr. Sattler, engaged Ernest Morton, Jr. to represent him in a civil action to recover damages for the arson. *See, Sattler v. Bailey*, 184 W.Va. 212, 400 S.E.2d 220 (1990). Respondent, recently hired by Mr. Morton as an associate, assisted in the representation. In December 1983, Mr. Morton and respondent filed a bill of discovery in the Circuit Court of Nicholas County asking for a copy of the Shelton Report. Judge Strickler did not require disclosure of the Shelton Report at that time, concluding that it would be improper to release the Shelton Report until possible criminal prosecutions, for instance, federal criminal prosecutions, were completed.

On 5 January 1984, respondent visited the U.S. Attorney's Office for the Southern District of West Virginia to report his suspicions of criminal activity in Nicholas County. On the same day, Judge Strickler contacted a friend of his who knew members of the U.S. Attorney's staff, and pursuant to this conversation, set up a 30 March meeting among Judge Strickler, David Faber (the U.S. attorney at the time), and FBI agents. So it happened that respondent and Judge Strickler separately maintained contact with federal authorities. It appears that respondent was unaware that Judge Strickler was assisting the U.S. Attorney's office.

About a year later, respondent and Judge Strickler had some unpleasant dealings. On 18 March 1985, Judge Strickler sentenced one of respondent's clients, Jerry Harlow, after Mr. Harlow pled guilty. Respondent had sought to withdraw the guilty plea or have the sentencing stayed on the ground that the prosecutor had breached the plea agreement. Judge Strickler stayed execution of the sentence pending appeal, and set bond for the defendant, but respondent failed to return an order in the case, so Judge Strickler issued a capias for the defendant's arrest.

Three days after the Judge issued the capias, respondent appeared before him in three matters. First, the judge held a hearing on discovery in the civil suit that Mr. Morton and respondent were handling for the owner of the Rebel Shelter tavern. Judge Strickler recused himself, because he heard that respondent and the tavern owner had made accusations to the U.S. Attorney's Office that he was part of the arson conspiracy. Respondent's employer, Mr. Morton, stated on the record that he did not join in the accusations.

On the same day, Judge Strickler held a hearing on the capias he had issued against Mr. Harlow. Respondent accused the Judge of having issued the capias in retaliation for respondent's activities in the arson case.

Also on the same day, Judge Strickler conducted a juvenile hearing, at which Mr. Harlow appeared as a prosecution witness, pursuant to his plea agreement. On advice of respondent, Mr. Harlow refused to testify, asserting the Fifth Amendment privilege against self-incrimination because he felt that his plea agreement might be set aside on appeal. Judge Strickler then granted Mr. Harlow transactional immunity, but respondent persisted in counseling Mr. Harlow to assert his Fifth Amendment privilege and refuse to testify. Even after the judge warned respondent not to obstruct the proceedings, respondent persisted, so the judge held him in contempt and jailed him.[2]

When Mr. Morton heard that respondent was jailed for contempt, he spoke with Judge Strickler. The judge said that he was willing to drop the matter if respon-

---

**2.** We addressed this incident in *Farber v. Strickler*, 175 W.Va. 328, 332 S.E.2d 629 (1985). Our unpublished order is given in a footnote to Justice McGraw's dissent.

dent would apologize, but respondent refused to apologize. Instead, respondent filed with us a petition for habeas corpus that stated, in part:

[I]t now appears that Judge Elmer Strickler has himself played a role in an alleged conspiracy to obstruct justice by virtue of the fact that as of this date he had not appointed a Special Prosecutor to investigate the criminal charges which are allegedly set forth in a certain police report relating to the destruction of the Rebel Shelter.

Respondent also asserted that Judge Strickler had issued the capias against Mr. Harlow in retaliation for respondent's "concerted efforts to determine who should in fact be held liable for the burning of Sattler's tavern." Respondent also asserted that Judge Strickler recused himself from the Rebel Shelter discovery matter because "he believed his office was under investigation by the U.S. Attorney's Office."

We ordered respondent's release, finding that he had been adequately punished for his over-zealous advocacy. When Judge Strickler filed formal contempt charges against respondent, respondent also filed with us a petition for a writ of prohibition. In the petition, he asserted:

The petitioner further informs this Court of his belief that since June of 1983, Judge Elmer D. Strickler has become inexorably linked in an alleged conspiracy to obstruct justice in Nicholas County, West Virginia. More specifically, the petitioner asserts that Judge Strickler, through his acts of omission and commission relating to a certain state police investigation into the firebombing of a tavern in March of 1982, has willingly participated in a cover-up of that arson case in an effort to protect several law enforcement officers and other public officials in Nicholas County from criminal prosecution.

To refute respondent's accusations, the U.S. Attorney, David Faber, Esquire, then executed an affidavit detailing Judge Strickler's assistance in the federal investigation of the arson, and filed it with this Court.

"DAVID A. FABER, upon being first duly sworn, deposes and says as follows:

1. That I am the United States Attorney for the Southern District of West Virginia, headquarter in Charleston, West Virginia, and that I have served as United States Attorney since January of 1982;

2. That during the latter part of 1983, or in early 1984, my office, through First Assistant United States Attorney Wayne A. Rich, Jr., was contacted by telephone by the Honorable Elmer D. Strickler, Circuit Judge of Nicholas County, West Virginia, to report various allegations of wrongdoing in Nicholas County and to request a federal criminal investigation with respect to those matters;

3. That as a result of the aforesaid actions of Judge Strickler, I met, on March 30, 1984, with Judge Strickler, Mr. Rich and a representative of the Federal Bureau of Investigation ("FBI");

4. That in his communications to my office and the FBI, Judge Strickler expressed substantial concerns about suspected criminal activity and possible violations of federal law in Nicholas County, West Virginia;

5. That subsequent to my meeting with Judge Strickler on March 30, 1984, as a result of the concerns expressed by Judge Strickler, and on the basis of information received from Judge Strickler and other sources, an investigation was initiated by this office, the FBI and the federal grand jury with respect to various matters in Nicholas County;

6. That Judge Strickler has been and continues to be fully cooperative with this office and the FBI with respect to this ongoing investigation;

7. That Judge Strickler is not and has never been, during my tenure as United States Attorney or otherwise to my knowledge, the subject of any federal investigation in this District, and has, to my knowledge, continuously conducted himself in the highest traditions of the judiciary, good law enforcement, and in the public interest;

8. That during the course of the aforesaid federal investigation, this office has been contacted on several occasions by Attorney Michael C. Farber of Webster Springs, West Virginia, who has been both encouraging this investigation and seeking information with respect to this investigation.

AND FURTHER THE AFFIANT SAITH NOT."

After Mr. Farber's affidavit was filed with this Court, Mr. Farber, instead of apologizing to Judge Strickler, demanded that the U.S. Attorney file another affidavit detailing *respondent's* assistance in the federal investigation.

Even after learning that Judge Strickler had been quite helpful to federal authorities in the investigation, respondent continued to make the same accusations. During oral argument on the petitions for prohibition and habeas corpus, respondent's counsel was asked if respondent would, that day, retract his accusations. Instead of retracting them, respondent filed an affidavit the next day, stating:

> I do not acquiesce, recant or renounce in any fashion the accusations I made against Judge Strickler following my arrest for contempt on April 25, 1985.

Respondent continued to reallege that Judge Strickler participated in a cover-up of the arson, even when he utterly lacked a reasonable basis for the accusations. He made these accusations in a disqualification motion on the remanded Harlow matter, and in a recusal motion before another Judge. He also wrote a letter to the State Bar in which he restated his accusations against Judge Strickler, alleging that Judge Strickler, as a Mason, attempted to protect other Masons. Respondent testi-fied that he received this information from an anonymous informant who called him.[3]

Respondent appears to be one of those people who thinks that a conspiracy theory explains absolutely everything. Such a view of the world can be harmless enough. The man on the bar stool may do little harm when he says that fluoridated water is a communist plot, or that the moon landing was a hoax. However, when an officer of the court makes reckless accusations against judges and just about everyone else who does not let him have his way, he then harms innocent people and threatens the integrity of the legal system.

The record shows the State Bar to be correct in its contentions that:

> Respondent has apparent difficulty in separating rumor or suspicion from fact. He believes that every person owes him an answer to any question he poses. Those who choose not to respond or who do not support his methods or conclusions, are involved in a cover-up or are concealing improper activities.
>
> Respondent's actions disclose not only immaturity, but also an unwillingness to admit error or wrongdoing, when even normally recalcitrant men would do so. Respondent suffers from some type of underlying emotional disability which on occasion has impaired his ability to practice law effectively and which has a prejudicial effect upon the administration of justice.

The State Bar contends that respondent violated DR1–102(A)(4), DR1–102(A)(5) and DR7–102(A), set out earlier, and that respondent also violated DR8–102(B) which provides:

> 8–102(B) A lawyer shall not knowingly make false accusations against a judge or other adjudicatory officers.

---

**3.** In this world, anything is possible. We find it *highly* unlikely, but perhaps Judge Strickler was part of some Masonic conspiracy. Perhaps Judge Strickler is an alien from another planet, and plans to flatten West Virginia and turn it into a landing field for intergalactic invaders. However, respondent completely *lacks evidence* to support his accusations. At first, respondent may not have known of Judge Strickler's cooperation with federal authorities, so perhaps with his imagination running wild he could dream up a conspiracy. However, after learning the truth from the U.S. Attorney's affidavit, there was no excuse for his continued accusations. Again, perhaps the U.S. Attorney also was part of the same Masonic conspiracy. Perhaps everyone who has ever disagreed with Mr. Farber is part of the same conspiracy. However, there is no *rational* basis for believing that everyone who disagrees with respondent is part of a conspiracy.

We agree. In Syllabus Point 1 of *Com. on Legal Ethics v. Douglas,* 179 W.Va. 490, 370 S.E.2d 325 (1988), we addressed similar behavior on the part of respondent's arch-rival, Mr. James Douglas, and said:

> The Free Speech Clause of the First Amendment protects a lawyer's criticism of the legal system and its judges, but this protection is not absolute. A lawyer's speech that presents a serious and imminent threat to the fairness and integrity of the judicial system is not protected. When a personal attack is made upon a judge or other court official, such speech is not protected if it consists of knowingly false statements or false statements made with a reckless disregard of the truth. Finally, statements that are outside of any community concern, and are merely designed to ridicule or exhibit contumacy toward the legal system, many not enjoy First Amendment protection.

In fact, respondent's *practice* of lashing out with reckless accusations gave rise to Count I, the "pattern and practice" count.

There is courage, and then there is pointless stupidity. No matter what the evidence shows, respondent never admits that he is wrong. Indeed, sincere personal belief will, in the sweet bye and bye, be an absolute defense when we all stand before the pearly gates on that great day of judgment, but it is not a defense here when respondent's deficient sense of reality inflicts untold misery upon particular individuals and damage upon the legal system in general.

### III.

### Pattern and Practice of Contemptuous and Disruptive Behavior

### (The Committee's Count I)

The State Bar has found respondent guilty of a pattern and practice of misconduct. In its Complaint against respondent, the State Bar provided a list of examples of misconduct related to his false accusations of Judge Strickler in the Rebel Shelter matter:

1. In November of 1985, when Judge Dan O'Hanlon refused to listen to Respondent's *ex parte* telephone accusations that a special prosecutor's grand jury had been compromised, Respondent accused the Judge of not doing his job and threatened to tell the "feds"....

2. When Respondent was displeased with the pace at which the federal investigation was progressing, he accused an FBI agent of conspiring with then Senator Larry Tucker of Nicholas County to quash the federal investigation because Tucker and the agent had attended high school together.

3. Respondent accused the U.S. Attorney's Office of deliberately losing the criminal prosecution of Trooper Ralph Bailey because the prosecutors refused to call two witnesses Respondent thought they should have called.

4. Respondent accused Assistant United States Attorney Richard Glaser of favoritism toward Darrell Johnson on the issue of amount of restitution because of Glaser's friendship with Johnson' attorney. Respondent also accused Glaser of failing to inform Judge Hallahan that Johnson had given false testimony, because Respondent was displeased with the restitution proceedings.

5. Respondent accused Cynthia Turco, Special Counsel for the State Bar, of not seeking full recourse against James W. Douglas in the latter's ethics proceedings because they had been acquainted in law school.

6. Respondent accused Turco and Sherri Goodman Dusic, then Assistant Disciplinary Counsel, of retaliation against him in the bringing of these charges because he was critical of the manner in which the charges against Douglas were tried.

7. Respondent accused Attorney Robert King and his partner, James Arnold, of unethical and tainted misconduct with regard to the bringing of the instant ethics complaint against him because they were counsel for Judge Strickler in the Supreme Court proceedings; notwithstanding the fact that King had recused him-

self from participating in the matter after being retained by the Judge.

8. In his written closing argument on Count IV, Respondent accused one member of the Hearing Subcommittee of making an adverse evidentiary ruling supposedly in an effort to obstruct him from development of his defense.

The record supports the State Bar's allegations that Mr. Farber made these accusations. The record clearly shows all but one to have been made with an utterly reckless disregard for the truth.[4]

Respondent's telephone conversation with Judge Dan O'Hanlon, to which the Committee refers in part one of the pattern and practice count, is a particularly revealing example of respondent's tendency to lash out with irrational and reckless accusations anytime he is not getting his way. Thus, respondent's behavior shows him to be unfit to practice law at this time. The record gives us reason to suspect that respondent's misconduct is due more to some mental disorder than to rational, calculated malevolence, and perhaps he can be helped.

Accordingly, it is ordered that respondent's license to practice law be suspended for three months, that he undergo a psychiatric examination by a physician selected by the Ethics Committee of the State Bar and embark upon a course of appropriate treatment satisfactory to the Ethics Committee of the State Bar, if necessary, and that when readmitted to practice, his readmission be conditioned upon his having a supervising lawyer for a period of two years.

License suspended for three months; lawyer required to pursue medical treatment; lawyer's readmission conditioned upon supervision.

---

4. In all fairness to Mr. Farber, when the State Bar Investigative Committee looked into Mr. Farber's complaint against Mr. King, it found that, although Mr. King did nothing wrong, respondent's perception of the situation was understandable.