**In re James T. MADISON, Respondent.**

**No. SC 89654.**

Supreme Court of Missouri,
En Banc.

May 5, 2009.

Alan D. Pratzel, Sharon K. Weedin, Office of Chief Disciplinary Counsel, Jefferson City, MO, for Inf.

James T. Madison, Kansas City, MO, pro se.

PER CURIAM.

The office of chief disciplinary counsel (OCDC) seeks discipline for James T. Madison for multiple violations of the rules of professional conduct that occurred in the course of handling cases pending before two judges. Mr. Madison is ordered suspended from the practice of law indefinitely without leave to reapply for six months.

## I. FACTUAL BACKGROUND

James T. Madison was licensed to practice law in Missouri in 1997. On June 1, 1999, this Court reprimanded Mr. Madison because he pleaded guilty to felony aggravated assault in Kansas.[1] In addition to the reprimand, Mr. Madison was put on two years probation. One of the special conditions of probation was that Mr. Madison obtain anger management counseling. He completed the anger management counseling, and his probation was terminated on May 17, 2001. Thereafter, on March 1, 2006, Mr. Madison was admonished for violating Rule 1–1.4 (communication). The parties disagree as to whether Mr. Madison was admonished for three additional violations in 2003.[2]

The present disciplinary action stems from an October 24, 2005, letter from the

---

1. Mr. Madison states that the reprimand and conviction resulted from a fight with a man who had been rejected by Mr. Madison's ex-wife.

2. OCDC's records show that on January 31, 2003, Mr. Madison was admonished by a regional disciplinary committee for violating Rule 4–1.1 (competence), Rule 4–1.2 (lawyer shall abide by client's decisions concerning objectives of representation) and Rule 4–1.3 (diligence). Mr. Madison disputes that he received the letter containing these admonitions, noting that the copy presented at the hearing was not signed, but OCDC's counsel

then-presiding judge of the Jackson County circuit court, J.D. Williamson, who advised disciplinary authorities of three incidents of inappropriate behavior by Mr. Madison in his interaction with certain Jackson County judges in 2004 and 2005. The letter enclosed statements from three judges and other court personnel, an audio recording regarding these incidents, and copies of four letters Mr. Madison wrote to two of the judges.

OCDC filed an information charging Mr. Madison with violating the disciplinary rules prohibiting disrupting a tribunal, engaging in conduct prejudicial to the administration of justice, and making false statements concerning the qualifications or integrity of a judge.[3] Following a lengthy hearing, a disciplinary hearing panel (DHP) recommended that Mr. Madison be suspended from the practice of law with no leave to apply for reinstatement for 12 months and that his reinstatement be conditioned on his agreement to undergo a psychological evaluation and complete any anger management or other programs or therapies recommended as a part of that evaluation. Mr. Madison rejected the proposed discipline. This proceeding followed.

## II. STANDARD OF REVIEW

"The findings of fact and conclusions of law of the disciplinary hearing panel are advisory. 'This Court [in a disciplinary proceeding] reviews the evidence de novo, independently determining all issues pertaining to credibility of witnesses and the weight of the evidence, and draws

its own conclusions of law.'" *In re Belz*, 258 S.W.3d 38, 41 (Mo. banc 2008) (citations omitted). "[T]his Court is free to reject, wholly or in part, the recommendation of the disciplinary hearing panel." *In re Zink*, 2009 WL 186156, *2 (Mo. banc 2009) (citation omitted). "Professional misconduct must be proven by a preponderance of the evidence before discipline will be imposed." *In re Crews*, 159 S.W.3d 355, 358 (Mo. banc 2005).

## III. DISCUSSION

### A. Applicable Disciplinary Standards

The DHP found, and the record confirms, that Mr. Madison made statements in court and in letters to two Jackson County circuit court judges in which he suggested a lack of integrity of judges before whom he had appeared and of the judicial process, including accusations that the judges were arbitrary and ill-qualified to be judges, that one judge was part of an "evil network" of judges and lawyers, that one judge acted with a ruthless abuse of power and contempt for the law, and that one judge was unethical and the other had "stained" her judicial robes forever by her improprieties. Mr. Madison admits he made the statements at issue but stands by them. He asserts that his comments were "carefully researched," and that his conduct and statements neither violate the disciplinary rules nor subject him to sanction and certainly do not merit suspension. The DHP found that, to the contrary, Mr. Madison's actions violated Rule 4–3.5(d), Rule 4–8.2(a) and Rule 4–8.4(d).

informed the panel that a signed copy was in its permanent records, and the panel found that admonitions were given to Mr. Madison for these three violations.

3. Specifically, Mr. Madison was charged with violating Rule 4–8.2(a) (lawyer shall not make a statement that the lawyer knows to be false

or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge), Rule 4–3.5(d) (lawyer shall not engage in conduct designed to disrupt a tribunal), and Rule 4–8.4(d) (lawyer shall not engage in conduct prejudicial to the administration of justice).

Rule 4–3.5(d), directed toward a lawyer's conduct toward a tribunal, states: "A lawyer shall not: ... engage in conduct intended to disrupt a tribunal." Rule 4–8.2(a), directed toward false or reckless allegations by the lawyer as to the qualifications or integrity of a judicial officer, states:

> A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.

Rule 4–8.2(a). Rule 4–8.4(d), directed toward the conduct of the lawyer as an officer of the court in general, states: "It is professional misconduct for a lawyer to: ... engage in conduct that is prejudicial to the administration of justice."

Mr. Madison implicitly suggests that, in determining whether he violated these disciplinary rules, this Court should consider his subjective intent. Unless it finds that he subjectively intended to disrupt the tribunal when he continued to argue with one judge after the judge ruled against his client in a landlord-tenant matter, and unless it disagrees that he "researched each and every assertion carefully before coming to an 'honest' opinion about each statement about both judges," he argues the Court should find that no violations occurred.

■ *In re Westfall,* 808 S.W.2d 829 (Mo. banc 1991), rejected a subjective standard. *Westfall* held that an objective standard applies, under which the finding of a violation depends "on what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances." *Id.* at 837, *quoting In Re Graham,* 453 N.W.2d 313, 322, *cert. denied sub nom., Graham v. Wernz,*

498 U.S. 820, 111 S.Ct. 67, 112 L.Ed.2d 41 (1990).

### B. Constitutional Issues Not Raised in This Proceeding

Although these disciplinary-rule violations largely involve speech by Mr. Madison, he does not assert that this case involves any First Amendment issue. It nonetheless is helpful to set forth the constitutional standard for judging when attorney speech crosses the line from permissible comment about matters affecting clients or the administration of justice and becomes, instead, a violation of an attorney's duties as an officer of the court as set forth in the disciplinary rules.

■ As noted in *Westfall,* 808 S.W.2d at 829, the canons of professional ethics first were issued by the American Bar Association to codify the United States Supreme Court's announcement in *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871), that it was adopting:

> severe restrictions on the right of attorneys to criticize the judiciary: "[T]he obligation which attorneys impliedly assume ... when they are admitted to the bar, [is to] maintain at all times the respect due to courts of justice and judicial officers. This obligation ... includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts." *Id.* 80 U.S. at 355.

*Westfall,* 808 S.W.2d at 834. Later cases have made clear that debate and public comment regarding the judiciary is protected speech but that, "[w]here unbridled speech amounts to misconduct that threatens a significant state interest, the state may restrict a lawyer's exercise of personal rights guaranteed by the Constitution." *Id.* at 835. For this reason:

> Lawyers must execute their professional responsibilities ethically and pursuant to

rules, carefully considered, in order to ensure the confidence of both litigants and the public. *Statements by a lawyer impugning the integrity and qualifications of a judge, made with knowledge of the statements' falsity or reckless disregard of their truth or falsity,* can undermine public confidence in the administration and integrity of the judiciary, thus in the fair and impartial administration of justice.

*Id.* at 836 (emphasis added).

█ This standard is codified in Missouri's rules of professional conduct, the preamble to which provides that attorneys zealously must advance and protect their clients' legitimate interests "while maintaining a professional, courteous, and civil attitude towards all persons involved in the legal system." Preamble, ¶ 9. Lawyers also must demonstrate respect for the legal system and those who serve it, including judges. Preamble, ¶ 5. Rule 4–8.2(a) and the comments thereto state that a lawyer may express honest and candid opinions that are aimed at improving the administration of justice, but that: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard to its truth or falsity concerning the qualifications or integrity of a judge." *Id.* "[A]n attorney may not, by speech or other conduct, resist a ruling of the trial court beyond the point necessary to preserve a claim for appeal." *In re Coe*, 903 S.W.2d 916 (Mo. banc 1995), *quoting Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1071, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991).

Here, the DHP found that Mr. Madison's conduct went beyond these standards in that he made reckless statements regarding the qualifications and integrity of a judge, resisted a judge's ruling beyond

that necessary to preserve a claim for appeal, and disrupted the court and acted in a manner prejudicial to the administration of justice. Mr. Madison does not claim that his conduct was protected speech or proper as a matter of law but rather that it was protected because it was true and so was justified in fact. It is in this context that this Court will examine the allegations of misconduct against Mr. Madison.

### C. Conduct for which Discipline is Sought

#### 1. Harassment of Judge Who Continued Jury Trial

Mr. Madison represented the plaintiff in a personal injury case filed in September 2002. The case was set for a jury trial in Jackson County circuit court beginning Monday, August 15, 2005. Because of a unique family situation that arose, the judge informed her staff that she was unable to be present for the scheduled trial that day. She asked them to attempt to find another judge to try the case in her place, as is the practice in Jackson County when a judge is unable to hear a case for some reason. Unfortunately, it turned out that another judge was not available that day, and the matter had to be continued. The judge's staff did not provide details to Mr. Madison or other counsel regarding the reason the originally assigned judge could not be present, although he claims that someone told him that it was not an emergency.

Mr. Madison took great offense at not being told the reason for the judge's absence. He thought that it was his right to know exactly why the judge did not appear and that the failure to appear caused his client to believe that the court must be involved in a conspiracy against her.[4] Mr.

---

**4.** Docket sheets presented at Mr. Madison's

hearing show that this judge tried more jury

Madison, therefore, sent the judge a letter, stating in part:

> I am extremely disappointed in your conduct. You arbitrarily failed to show for this extremely important trial without excuse or apology.... Apparently, you think that you are the most important person in this process and are beyond such apology and explanation.

He also accused the judge of having filed a bar complaint against a black attorney because that attorney did not appear for a hearing of which he had no notice and wondered if the judge ever had made such a complaint toward a white attorney.

In the final paragraph of the letter, Mr. Madison asked the judge to recuse herself from the case. At Mr. Madison's hearing, the judge testified that when she received Mr. Madison's letter, she found the accusations of racism insulting and offensive. She testified that she did not know who Mr. Madison was and did not know the black attorney against whom she allegedly filed a bar complaint.[5] She could not read the entire letter at first because she found it very hostile. She recused herself as Mr. Madison requested and so advised Mr. Madison by return letter. Despite her recusal, a few days later, Mr. Madison sent her a second letter,[6] parts of which stated:

> [Y]our system of justice allows you on the one hand to berate and unjustly file a bar complaint against an African–American attorney, [name omitted] for

being late to an un-noticed hearing and on the other hand nonchalantly failing to appear to preside over a very serious case in which a person, who was seriously handicapped negligence alleged in the petition, has their very life "hanging in the balance.".... Your indulgence in Argumentum ad Hominem towards me is not justice. It is a denial of justice. But for the gravity of the harm done, I would do what most have done. I would have ignored the tyranny.... I want you to be clean. I passionately desire to show my client that you are not drunk with power.... I do have profound doubts concerning your fitness to preside fairly over cases.

Because the judge already had recused herself, she did not respond to the second letter.

Two months later, and despite the case's reassignment to a different judge, Mr. Madison wrote her a third letter that stated in part:

> Your decision to withhold an honest explanation for your absence has propelled us all into inauspicious entanglements.... If you had timely explained your absence, [my client] would not have been cast into dark paranoia about you and the defendants conspiring to deny her justice. That paranoia not only lead [my client] to settle her case for pennies on the dollar, it has lead her and her family to a firm belief that "your" sys-

trials than any other judge in Jackson County in 2005. The judge testified that she never had been unable to be present for a jury trial on any other occasion and that a family matter involving her elderly parents had caused her to have to take unanticipated time off that week.

5. Mr. Madison says that this Court should not consider statements in his letters to the judge, such as his allegations of racism, which were not specifically quoted in the information as a basis for discipline. The information alleged

that the judge "was offended by the contents of and the demands made by [Mr. Madison's] letter" and found the context of all three letters offensive, however, so each letter as a whole is relevant to the charges in the information. The letters are also relevant to his defense that he "carefully researched" the allegations in all of his letters, because he never gave any support for these allegations.

6. All excerpts are quoted verbatim.

tem of justice is corrupt. That belief will permeate the community and people will know you and the 16th Circuit for this act of infamy. Your robe is forever stained because you have failed to avoid impropriety or even the appearance of impropriety.

It is the opinion of attorneys and non-attorneys that you and your "evil" network will seek vengeance upon me for challenging you in this manner.

The judge testified that on receiving the third letter, she feared Mr. Madison's letters never were going to stop. She had learned that Mr. Madison had a conviction for felony aggravated assault and became worried about her physical safety and that of her family. She began locking the door between the jury box and her chambers, something she never had done before. She advised her staff and the sheriff's office to let her know if Mr. Madison came into the courthouse. At her request, the sheriff's department began to watch over her each evening when she walked from the courthouse to her car.

### 2. Allegations Related to Landlord–Tenant Case

Mr. Madison appeared on March 16, 2005 in Jackson County circuit court representing a landlord seeking back rent and possession of an apartment. Mr. Madison did not bring a witness for the landlord. The tenant appeared and disputed the amount claimed due. The judge told Mr. Madison and the tenant to go into the hall to try to settle the matter, an approach he usually found to be effective. While Mr. Madison later claimed he and the tenant had gone to the hall and discussed the

matter, neither the judge nor his assistant observed Mr. Madison leave the courtroom. They saw him return to his seat in the courtroom and begin staring at the judge in such a manner that the judge's administrative assistant became concerned about Mr. Madison's demeanor. She continued to watch Mr. Madison so that, if needed, she quickly could press the "panic button" used to summon the sheriff's department in emergencies.

Ten minutes later, the judge called Mr. Madison's case a second time. Mr. Madison told the judge that the tenant admitted she had not paid rent but claimed the landlord's agent had excused her rent for a period of time. The judge offered several future dates for trying the case, making it clear that he believed Mr. Madison would need a witness to make his case in light of the tenant's anticipated denial of the debt. Mr. Madison rejected the suggestion, stating that he was unavailable on the proposed dates, believed he could handle the matter with cross-examination rather than with his own witness and still hoped to "handle the return today."

In deference to Mr. Madison's wishes, the judge came back to the case after he had cleared the rest of his docket, at which point Mr. Madison was becoming increasingly agitated. The judge put the tenant under oath and questioned her himself, as he said was his practice in cases involving *pro se* parties.[7] At the conclusion of the judge's questioning, he ruled that all but the last month's rent had been excused. He did so without expressly inviting Mr. Madison to cross-examine the tenant. Mr. Madison never asked that he be allowed to cross-examine the tenant either. Instead,

7. The tenant acknowledged the lease and the ledger showing she owed more than $1,000 in rent but testified that the landlord's agent had excused all but the March rent because the property was infested with mice and roaches.

The tenant's admission that she owed some rent gave her credibility in the judge's judgment. He granted possession of the property to the landlord and entered judgment for $350 plus costs.

he began arguing with the judge, telling him that he was wrong on the law. The judge advised Mr. Madison that it was not his intention to argue about the judgment, whereupon they had the following exchange.

MR. MADISON: Judge, I just—I object. There's no basis in the law for you to excuse her rent, and—

JUDGE: Sir, I'm not making any comment in regard to the evidence. You're out of line in regard to arguing with me in regard to the judgment. It has been rendered already. Now, as an attorney, you know that there are appropriate manners within which you can present any claims or arguments that you have with the court. And what I'm doing at this time, as stated before, is entering a judgment in favor of plaintiff for the possession of the property and $350 for the rent plus costs. And that is the judgment. That's it. That's it. Okay.

MR. MADISON: There's no basis in law. No basis in law.

JUDGE: Mr. Madison, this is a question of fact, not law.

MR. MADISON: She admitted that she didn't—

JUDGE: Mr. Madison, we had an issue. You have the means by which to take it up. Don't argue with me.

MR. MADISON: I'm not arguing. I'm just telling you the law, Judge. No way around it—

JUDGE: We can go back to—

MR. MADISON:—Judge Sawyer [it is unclear to whom Mr. Madison was referring] at the appellate court, whatever.

JUDGE: Mr. Madison.

MR. MADISON: Judge—

JUDGE: Get out of this courtroom. Okay. That's it. I'm through talking to you.

MR. MADISON: No basis in law for that.

The judge's administrative assistant testified that Mr. Madison's tone was very defiant during this exchange. It is unclear from the recording whether Mr. Madison's voice was sufficiently loud to be deemed "yelling," as Mr. Madison was not standing near the microphone, but it is clear that his tone increased greatly in volume during the exchange. A lawyer present in the courtroom during this time testified at Mr. Madison's hearing that he remembered thinking to himself then that he would never talk to a judge "like that." An employee of this lawyer who also witnessed the events testified that Mr. Madison had an arrogant attitude, that his behavior was disruptive and disrespectful, and that people in the courtroom were shocked. This employee also testified that Mr. Madison's facial expressions and body language conveyed that he was very irritated with the judge and that Mr. Madison "didn't think the judge knew what he was doing." While Mr. Madison says this testimony all should be discounted because none of the witnesses could recreate the exact words used or reasons why they thought his behavior was inappropriate, this Court finds their testimony credible, as did the panel.

Although it is obvious from Mr. Madison's statements that he was very upset with the judge's ruling, which he felt was not legally supportable, he specifically chose not to appeal the ruling. Instead, later that day Mr. Madison sent a letter to the judge that stated, in part:

"you were not faithful to the law."

"you showed contempt for the law and for this lawyer"

"in your ruthless abuse of power and contempt for the rule of law, you silenced me and ordered me out of your court."

"your decision was unfair and blatantly without legal basis. An appeal would find that you abused discretion and violated the Code of Judicial Conduct."

"The consequence of your unethical conduct is the loss of money to my client.... So, you wrongfully took from my client $1,005.00 today and gave it to the defendant."

Mr. Madison later testified he wrote the letter simply because he wanted to tell the judge that what the judge did was wrong. He stood by the accuracy of his letter before the panel and before this Court, arguing that the statements in the letter were factually correct and only made after "research and investigation." Yet, although the letter accuses the judge of misconduct and unethical behavior, Mr. Madison did not file a complaint with the Commission on Retirement, Removal and Discipline, and, although he says he would win on appeal, he did not file an appeal.

## IV. CONDUCT MERITING DISCIPLINE HAS BEEN PROVEN

▆▆▆ Although, as noted, Mr. Madison admits he engaged in most of the conduct and made most of the statements just set out,[8] his defense is that none of this conduct and none of his allegations as to the judges' lack of qualifications or integrity should form the basis for discipline because they are all true. In particular, he believes that the judge who continued his client's jury trial did not have a good reason for doing so, and he believes that the judge who handled the landlord-tenant matter wrongly decided the case and wrongly denied him the opportunity to

cross-examine the tenant. He thinks this fully vindicates his accusations and other conduct.

Mr. Madison misapprehends the basis for discipline, although it clearly and repeatedly was explained to him in the record and in the briefs filed by OCDC. His complaints are with the merits of one judge's rulings and with whether another judge acted properly in failing to hear his case when scheduled. There are established mechanisms for raising such issues. Lawyers concerned with a court's ruling have an appropriate avenue to challenge that ruling through an appeal. Rule 81.01. Lawyers believing a judge is biased have an appropriate avenue to challenge that judge by seeking recusal. Rule 51.07. Mr. Madison is aware of how to file an appeal; his letter to the judge in the landlord-tenant matter noted that he knew he could appeal but chose not to do so. Mr. Madison is aware of his right to ask a judge to recuse, as he did so, and the judge did, in fact, recuse herself. Yet he continued to harass that judge about the continuance. He also is necessarily aware, as are all lawyers licensed in Missouri, that if he believes an ethical violation has occurred, he is required to file a complaint with the Commission on Retirement, Removal and Discipline. Rule 4–8.3(b). Mr. Madison never filed such a complaint against either judge.

Moreover, while Mr. Madison says he engaged in careful research that supports each statement in his letters, he offered no factual basis for his innuendos and assertions. As to the judge whose absence caused his case to be continued, all Mr. Madison knew was that the judge was unable to attend, for a reason not known and not explained to him by her staff, and

---

8. He denies having yelled at the judge in the landlord-tenant matter and denies that he

failed to confer with the tenant as directed by the judge.

that another judge was not available to take her place, so the case had to be continued. Mr. Madison never learned why she was unable to appear—indeed, that is his complaint. Yet he nonetheless asserted in his letters, and in part to the media and other members of the public, that her reasons were arbitrary, that she was racist and treated him differently because he was black, that she was part of an "evil" network and would seek vengeance upon him, that she could not uphold the high ideals of her office, that she apparently thought she was the most important person in the legal process, that he had profound doubts about her fitness to preside over cases and that she seemed to be drunk with power, and that her robe was "forever stained" by her failure to avoid unspecified improprieties. The only evidence he offered to support any of these assertions was that she was unable to appear one Monday for a trial.

As to the second judge, the only "misconduct" that Mr. Madison has identified is that the judge allegedly denied him the opportunity to cross-examine a witness and was incorrect as to the relevant law. Even if true, this would constitute an error that at most would entitle his client to a new trial *if* Mr. Madison had appealed. Mr. Madison chose not to appeal, although he was aware he could do so. Nothing about the alleged legal errors by the judge, however, justifies arguing with the judge after the judge has said the ruling is final or refusing to leave the courtroom when requested to do so. Nothing about the judge's alleged legal errors supports the allegations that the judge showed contempt for the law or Mr. Madison, that the judge acted with a ruthless abuse of power, or that the judge was unethical or "took" money from Mr. Madison's client, as Mr. Madison's letter states.

Far from being "careful" or "well-researched," Mr. Madison's allegations against both judges were completely without factual basis and were made in the heat of anger and pique. The conduct falls far below the standard of "what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances." *Westfall,* 808 S.W.2d at 837. The allegations were made either with knowledge of their falsity or with reckless disregard as to their truth. They were intended to disrupt the legal process, and they did so needlessly. They further caused one judge to recuse herself unnecessarily from a case and put her in fear for her safety. This conduct was prejudicial to the administration of justice.

In *In re Arnold,* 274 Kan. 761, 56 P.3d 259, 263–64 (2002), an attorney similarly sent a letter to a judge after an unsuccessful court appearance. The letter stated that the judge should *"please* [emphasis in original] seriously consider retiring from the bench," that the judge did not "have what is required" to do his job, was "absurdly fastidious" about rules and decorum, and that this masked "an underlying incompetence. You act like a robot." The Kansas Supreme Court found that this letter contained unrestrained and intemperate statements that the speaker knew or should have known were false and constituted a violation of his duty to the profession. *See also Notopoulos v. Statewide Grievance Committee,* 277 Conn. 218, 890 A.2d 509, 516–17 (2006) (attorney reprimanded where he presented no factual basis for his statements about judge that were made either knowing they were false or with reckless disregard for their truth); *Anthony v. Virginia State Bar,* 270 Va. 601, 621 S.E.2d 121, 126 (2005) (derogatory statement concerning qualifications or integrity of judge made without basis tends to diminish public perception of integrity

of courts and is subject to discipline); *Committee on Legal Ethics of the West Virginia State Bar v. Farber*, 185 W.Va. 522, 408 S.E.2d 274 (1991) (three-month suspension appropriate for attorney who blamed conspiracy for his losses and was unable to separate fact from fiction or to admit the wrongfulness of his conduct).

Mr. Madison's conduct was even more egregious than that disciplined in the above cases. His conduct and statements were prejudicial to the administration of justice, disrupted the tribunal, and impugned the integrity and qualifications of two judges in reckless disregard of the truth of his claims. His conduct violates Rule 4–3.5(d), Rule 4–8.2(a) and Rule 4–8.4(d), and merits discipline.

## V. SUSPENSION IS APPROPRIATE

 Having found that Mr. Madison violated each of the enumerated disciplinary rules, this Court turns to the question of the appropriate discipline. The ABA Standards for Imposing Lawyer Sanctions (1992 ed.) provide useful guidance in this regard. *See, e.g., Belz*, 258 S.W.3d at 39; *Crews*, 159 S.W.3d at 360–61.

ABA Standard 3.0 states that a court will look at four primary factors in determining which sanction is appropriate: (1) the duty violated; (2) the lawyer's mental state; (3) the potential or actual injury the conduct caused; and (4) aggravating and mitigating circumstances. The definitions section of the ABA Standards provides that the term "injury" includes harm to the legal system or the profession, that acting with "intent" means having "a conscious objective or purpose to accomplish a particular result," and that acting with "knowledge" means "a conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish" that result. *Id.*

Mr. Madison impugned the integrity of both judges in his letters and in his verbal address to the judge hearing the landlord tenant matter, violating Rule 4–8.2(a). He admitted at his hearing, and in this Court, that he intentionally sent these letters and continues to believe that they were appropriate and deserved. He has expressed no remorse. The letters were utterly without factual support. Mr. Madison made no attempt to correct what he perceived as legal errors or improprieties by the means provided for in law—appeal or the filing of a complaint with the disciplinary authorities.

Mr. Madison did not limit his allegations about the judge who continued his case to her alone; he repeated many of his allegations to both lawyers and non-lawyers, including a television reporter, causing the judge and the court embarrassment and requiring them to explain what was a simple need to continue a case due to an inability of the judge to attend for personal, family reasons.

Mr. Madison's accusations were made either intentionally or in reckless disregard for their truth. Under ABA Standards 6.13 and 6.23, a reprimand is appropriate only when the lawyer disrupts a tribunal negligently. That is the sanction imposed by this Court in *Coe*, 903 S.W.2d at 918, for conduct by an attorney disruptive to and disrespectful of the court in the course of a trial where the attorney had no dishonest motive, offered a profuse public apology and agreed to avoid similar misconduct. Similarly, in *Westfall*, although the attorney made disrespectful and unsupported comments to the press about a court with whose ruling he disagreed, the case involved an issue of first impression, and the attorney privately apologized.

By contrast, ABA Standard 6.22 states that suspension is usually the appropriate

sanction when a lawyer knowingly causes interference or potential interference with a legal proceeding. ABA Standards 6.1 and 6.12 state that suspension is appropriate when the case involves "conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court." Mr. Madison's conduct merits suspension, in the absence of consideration of aggravating and mitigating factors.

Mr. Madison says mitigating factors are that he had reason for his conduct because the judges' conduct was wrong in both instances, that he was just trying to protect the interests of his clients, and that he has practiced without additional incident since these violations occurred in 2005.

The DHP found, however, that Mr. Madison had selfish motives in making his comments. They arose from his desire to correct what he saw as purported transgressions by the judges, without regard to whether it would disrupt the tribunal or cause harm, and that this was part of a pattern of misconduct. His actions did not further any interest of his clients—he settled one case and failed to appeal the other. He simply satisfied his own need to vent his feelings, which were unsubstantiated by any facts known to him at the time he wrote his letters. His arguments in mitigation are without merit, other than the lack of additional misconduct since 2005.

Aggravating circumstances clearly are present. Mr. Madison has a prior disciplinary history, including a reprimand arising out of a felony aggravated assault conviction. Even in this Court, he refused to acknowledge the wrongfulness of his conduct. He acted with a dishonest or selfish motive and displayed a pattern of misconduct. He has had substantial experience in the practice of law and knows what type of conduct is expected of a lawyer. These factors favor an increase in the appropriate sanction under ABA Standard 9.2 and under this Court's precedent.[9]

A further aggravating circumstance occurred while this case was pending before the DHP, resulting in a disruption of the disciplinary proceedings. Mr. Madison decided that in order to present his side in the disciplinary action, he needed to take "fairly in-depth video depositions" of both judges. He stated that he planned to ask the judge who continued the case personal questions about why she was unable to attend court that day and to depose her husband so he could get to the truth of why she was not at court that day. Counsel for the judges tried to reach an agreement with Mr. Madison concerning the scope of the discovery, but Mr. Madison refused to sign an agreement to limit discovery. Mr. Madison also refused to sign an affidavit in which he would agree to refrain from using the videotaped deposition testimony for any purpose other than the disciplinary hearing.

Because of this impasse, counsel for the judges sought a protective order, which was granted by the DHP's presiding officer, who ruled that the issue in the disciplinary action was Mr. Madison's conduct,

9. *See, e.g., In re Wiles,* 107 S.W.3d 228 (Mo. banc 2003) (prior disciplinary history and pattern of misconduct are aggravating factors making reprimand insufficient to ensure the protection of the public and integrity of the legal profession); *In re Donaho,* 98 S.W.3d 871, 876 (Mo. banc 2003) (aggravating factors include intentional and deceptive nature of actions, plus refusal to acknowledge dishonesty); and *In re Cupples,* 979 S.W.2d 932, 937 (Mo. banc 1998) ("Factors considered in aggravation include: prior disciplinary offenses; dishonest or selfish motives; a pattern of misconduct; multiple offenses; refusal to acknowledge the wrongful nature of conduct; substantial experience in the practice of law. . . .")

not that of the judges. The protective order also provided that the depositions would be limited to relevant matters and that a deposition of the judge's husband would not be permitted. The parties stipulated that the depositions would be taken at the offices of the DHP's presiding officer and would be scheduled so that the presiding officer could be available to rule on any objections during the deposition that needed to be addressed immediately. The judges' depositions then were scheduled by agreement of the parties and their counsel.

Ironically, when considered in light of the fact that the focus of three of Mr. Madison's letters was a judge's allegedly arbitrary failure to appear for a scheduled trial, Mr. Madison failed to appear at the scheduled deposition. At the time the deposition was to begin and with other participants present and waiting, he called the presiding officer and advised that he would not be attending. He said he did not have to give advance notice to any of the participants that he was not going to conduct the deposition because he never had provided a formal written deposition notice but rather simply had set a date and time informally for the deposition.

In a subsequent telephone call, the presiding officer advised Mr. Madison that, as a result of the delay and inconvenience caused by his failure to appear, any future discovery would have to be arranged through the presiding officer. At this point, Mr. Madison began shouting and would not allow the presiding officer or anyone else to interject. Ultimately, the telephone conference had to be terminated because Mr. Madison continued to yell and refused to allow anyone else to speak.

Unhappy with the ruling that future depositions would have to be scheduled with leave from the presiding officer, Mr. Madison then filed a motion to disqualify the presiding officer. In his motion, Mr. Madison went so far as to suggest that the presiding officer was also a part of the "evil" conspiracy in which he asserted one of the judges was involved. The panel overruled the motion.

This Court agrees with the panel that Mr. Madison's inappropriate and uncooperative conduct toward the panel, his lack of respect for the tribunal shown through his shouting at the presiding officer and his failure to attend a deposition he had scheduled are properly considered as additional matters in aggravation. They are a continuation of the pattern Mr. Madison had established in his letters to the two judges discussed above of blaming any setback on a conspiracy against him and refusing to acknowledge the wrongfulness of his own conduct.

Considering Mr. Madison's conduct in light of the aggravating and mitigating factors shown, and with knowledge of the sanctions imposed for similar conduct by other courts, this Court finds that a reprimand is insufficient. This Court directs that Mr. Madison be suspended from the practice of law without leave to reapply for six months and with the conditions on readmission set out below.

## IV. CONCLUSION

Mr. Madison is suspended indefinitely with no leave to reapply for six months. Reinstatement will be conditioned on meeting the requirements for readmission set out in this Court's rules and, in addition, will require a specific showing that he has undergone a psychological evaluation and completed anger management or other programs or therapies recommended as a part of that evaluation as a condition of reinstatement, and that he has attended

the ethics school conducted by OCDC.[10]

STITH, C.J., PRICE, RUSSELL, BRECKENRIDGE and FISCHER, JJ., concur; WOLFF, J., concurs in separate opinion filed; TEITELMAN, J., concurs in opinion of WOLFF, J.

MICHAEL A. WOLFF, Judge, concurring.

I concur with the principal opinion. I write separately to emphasize that this case is about conduct, not speech. In my view, *In re Westfall,* 808 S.W.2d 829 (Mo. banc 1991), which involved only speech, was decided wrongly.

---

**10.** *See, e.g., Farber,* 408 S.E.2d at 286 (three-month suspension and requirement that attorney undergo psychological evaluation before reinstatement where attorney engaged in in-appropriate behavior including lashing out with irrational and reckless allegations when attorney did not get his own way).