In re Larry D. COLEMAN, Respondent.

No. SC 89849.

Supreme Court of Missouri,
En Banc.

Sept. 15, 2009.

As Modified on Denial of Rehearing
Nov. 17, 2009.

Alan D. Pratzel, Shannon L. Briesacher, Office of Chief Disciplinary Counsel, Jefferson City, MO, for appellant.

Larry D. Coleman, Raytown, MO, for respondent.

PATRICIA BRECKENRIDGE, Judge.

The Office of Chief Disciplinary Counsel (OCDC) seeks discipline of Larry D. Coleman for multiple violations of the rules of professional conduct in his representation of a client in three cases and one violation for the improper handling of his IOLTA account. This Court finds that Mr. Coleman violated Rule 4–1.2, Scope of Representation, by accepting a settlement offer in a wrongful death case without the consent of his client and filing a motion in that case requesting that the court enforce the agreement despite his client's refusal to settle; Rule 4–1.7, Conflict of Interest, by entering into written agreements with his client purporting to give him the exclusive right to settle her three cases and taking direct, adverse action against his client's directives when he filed and proceeded on a motion to enforce the agreement; Rule 4–1.15, Safekeeping Property, by failing to keep his personal funds separate from his IOLTA account; Rule 4–1.16, Declining or Terminating Representation, by failing to take reasonable steps to protect his client's interest on termination of representation; and Rule 4–8.4, Misconduct, by violating other rules of professional conduct and by engaging in conduct that is prejudicial to the administration of justice.[1] Mr. Coleman is suspended from the practice of law, with execution of such suspension stayed, subject to Mr. Coleman's completion of a one-year term of probation in accordance with conditions imposed by this Court.

**Factual and Procedural Background**

Larry D. Coleman was licensed to practice law in Missouri in 1977. Mr. Coleman has had three prior disciplinary matters. Mr. Coleman was admonished in 1990 for failure to communicate with a client and for unreasonable fees. He was admonished in 1999 for failure to act with reasonable diligence, to expedite litigation and to communicate with a client. In April 2008, he received a public reprimand for violations regarding diligence, unreasonable fees, and conduct prejudicial to the administration of justice.

The present disciplinary action arises from his representation of a client, Vera Davis, and his handling of his IOLTA account. Beginning in July 2001, Ms. Davis hired Mr. Coleman to represent her in three separate civil actions that eventually were pending simultaneously. Ms. Davis hired Mr. Coleman to represent her in a wrongful death action for medical malpractice in the death of her sister. She then hired Mr. Coleman to represent her in a wrongful termination case against her employer, Two Rivers Psychiatric Hospital. Finally, Ms. Davis hired Mr. Coleman to represent her in a discrimination claim against her employer, Western Missouri Mental Health Center. The fee agreement in each case required Ms. Davis to pay Mr. Coleman nonrefundable retainers of $5000, $2000 and $1000 respectively, and then an hourly rate of $200 per hour. In addition, the agreement required Ms.

---

1. All citations are to the 2007 Missouri Rules of Professional Conduct, unless otherwise indicated. Mr. Coleman's violations of the rules of professional conduct, except his IOLTA account violations, all occurred prior to July 1, 2007, when amendments to the rules took effect. Mr. Coleman's IOLTA account violations occurred from March to June 2008, so they are governed by the version of Rule 4–1.15 in effect from January 1 to July 1, 2008. The subsequent amendments to the rules do not change the essence of the rules.

Davis to pay the litigation expenses in each case.

From July 2001 to September 2006, Mr. Coleman periodically sent bills to Ms. Davis for his legal fees and expenses in the three cases; as the bills arrived, Ms. Davis paid them. Ms. Davis did not keep a ledger or receipts for all monies she paid to Mr. Coleman, but she was able to produce receipts for payments of more than $38,000. She believes she may have paid him up to $50,000, which Mr. Coleman does not dispute. Mr. Coleman did not maintain copies of any documentation showing his billable hours, the litigation costs accrued, or her payments. Mr. Coleman maintains that his records of all bills and statements were delivered to Ms. Davis when she picked up her legal files from his office.

In July 2006, the state of Missouri, on behalf of Western Missouri Mental Health Center, made an offer to settle Ms. Davis' discrimination claim for $20,000. When Mr. Coleman advised Ms. Davis of the settlement offer, she told him that she did not find the settlement offer acceptable and instructed him to reject it. In September 2006, Ms. Davis informed Mr. Coleman that she no longer had the financial ability to pay him as previously agreed. Mr. Coleman proposed that their fee agreements in her three cases be converted to contingent fee agreements. For each case, Mr. Coleman prepared a written contingent fee agreement, which he executed and mailed to Ms. Davis. Each agreement provided that Mr. Coleman was forgiving any currently owed fees in exchange for the right to one-third of any future recovery.[2] Mr. Coleman also included the following provision in each agreement:

In consideration of one-third (1/3) of any recovery, I agree to forego my hourly rate, and instead, agree to accept one-third of any recovery. However, because I am taking a risk with you on this case, and because I am more familiar with the legal trends relative to judgments, settlements, and summary disposition, you agree I shall have the exclusive right to determine when and for how much to settle this case. That way, I am not held hostage to an agreement I disagree with.

Mr. Coleman did not explain or otherwise discuss this clause with Ms. Davis prior to the execution of the agreements. Ms. Davis signed each of the new agreements.

In October 2006, the state, on behalf of Western Missouri Mental Health Center, again offered to settle Ms. Davis' case for $20,000. When Mr. Coleman advised her of the offer, Ms. Davis again informed Mr. Coleman that the offer was unacceptable. Without Ms. Davis' consent, Mr. Coleman accepted the state's $20,000 offer. Mr. Coleman then informed Ms. Davis that he had settled her case against Western Missouri Mental Health Center for $20,000. Because it was necessary for Ms. Davis to execute the settlement documents to effectuate the settlement, Mr. Coleman repeatedly requested that Ms. Davis sign the documents. Ms. Davis refused and informed Mr. Coleman that she wished to proceed to trial.

In November 2006, Mr. Coleman sent a letter to Ms. Davis stating that, if Ms. Davis refused to sign the settlement agreement, Mr. Coleman would be forced to withdraw in all three of her cases or move the court to enforce the settlement agreement against Western Missouri Men-

2. The contingent fee agreements stated that Mr. Coleman forgave unpaid balances due of $4,387.69 in the wrongful death action, $3,249.89 in the Two Rivers case, and $9,647.94 in the Western Missouri Mental Health Center case.

tal Health Center despite her explicit refusal to settle. Thereafter, Mr. Coleman filed a motion in the Western Missouri Mental Health Center case to enforce the settlement agreement against Ms. Davis. In February 2007, the court ruled against Mr. Coleman and declined to enforce the settlement agreement. The court placed the case back on the trial docket for April 2, 2007. Mr. Coleman mailed her a copy of the order overruling his motion. He mailed Ms. Davis another letter, dated February 16, 2007, informing her that if she did not contact him in writing within one week of his letter, he would withdraw as her attorney. After more than one week had passed, on February 28, 2007, Mr. Coleman filed a motion to withdraw as Ms. Davis' attorney in the Western Missouri Mental Health Center case, citing Ms. Davis' failure to respond to his deadline as his reason for withdrawal. Mr. Coleman did not send Ms. Davis a copy of his motion to withdraw.

On March 2, 2007, Ms. Davis sent Mr. Coleman a letter requesting her files. Three days later, on March 5, 2007, Ms. Davis sent a representative to pick up her files. She took her files to one attorney and discussed her cases with another attorney. At some point, Ms. Davis received from the court a copy of Mr. Coleman's motion to withdraw, as well as a directive from the court that she respond on or before April 12, 2007, if she wished to object to Mr. Coleman's motion. Ms. Davis was uncertain as to how to proceed, so on April 5, 2007, she directed a letter to Mr. Coleman asking him a number of questions, including whether she needed to obtain another lawyer, what his fees were in her cases and whether he intended to assert attorney fee liens in her cases, the

status of each of her cases, and whether he anticipated that she would have any problems in her cases. Her letter directed Mr. Coleman to respond by the next day, April 6. Mr. Coleman did not reply to Ms. Davis' letter. On April 5, 2007, the same day that Ms. Davis wrote Mr. Coleman with questions about her case, Mr. Coleman sent a letter to Ms. Davis acknowledging that her files had been retrieved from his office. Mr. Coleman closed his letter by stating, "It was a pleasure to serve you." [3]

In May 2007, Ms. Davis filed an objection to Mr. Coleman's withdrawal in the Western Missouri Mental Health Center case because he had not provided the information sought in her letter. Despite her objection, the court granted Mr. Coleman leave to withdraw. Ms. Davis' case was placed on the fall 2007 accelerated trial docket. Unable to obtain new counsel, her case ultimately was dismissed.

During the time period described above, summary judgment was issued against Ms. Davis in her wrongful death action. In March 2007, Mr. Coleman filed an appeal of the summary judgment. Mr. Coleman then filed a motion to withdraw as Ms. Davis' counsel, which the court of appeals granted. Similarly, in June 2007, Mr. Coleman requested and was granted permission to withdraw as Ms. Davis' attorney in her wrongful termination action against Three Rivers. In July 2007, Ms. Davis filed a complaint against Mr. Coleman with OCDC. OCDC filed an information, in April 2008, charging that Mr. Coleman violated multiple rules of professional conduct in his legal representation of Ms. Davis and another client. In his answer, Mr. Coleman denied all of the alleged violations.

3. It is unknown whether Mr. Coleman or Ms. Davis was aware of the other's letter at the time of drafting his or her April 5th letter.

Independent to the issues arising out of his representation of Ms. Davis, other conduct by Mr. Coleman came to the attention of OCDC. In this Court's April 2008 order regarding Mr. Coleman's third disciplinary matter, Mr. Coleman was ordered to pay a $750 fee, plus costs, to the clerk of this Court. On or about June 11, 2008, Mr. Coleman wrote a check on his IOLTA account for the amount due. When it was discovered that Mr. Coleman paid his fee and costs from an IOLTA account, OCDC opened a complaint and initiated an investigation against Mr. Coleman.

OCDC discovered that Mr. Coleman regularly deposited checks for settlement proceeds into his IOLTA account. When a settlement check cleared the bank, it was Mr. Coleman's practice to pay out the client's share of the settlement proceeds to the client. Once his clients were paid, Mr. Coleman sometimes would leave his share of the settlement proceeds in the account and write checks to pay personal obligations directly out of the IOLTA account. Mr. Coleman did not keep records or ledgers identifying deposits into the account. OCDC amended its previously filed information to add an additional count, alleging that Mr. Coleman mishandled his IOLTA account by failing to hold client and third-party property separate from his own property.

A disciplinary hearing panel ("the panel") heard the matter in October 2008, and found there was insufficient proof to establish any violations regarding the other client. Regarding Mr. Coleman's representation of Ms. Davis, the panel found insufficient evidence that Mr. Coleman violated Rule 4–1.5, unreasonable or excessive fees; that the clause in the contingent fee contract purporting to give Mr. Coleman the exclusive right to settle Ms. Davis'

cases created a conflict of interest in violation of Rule 4–1.7; or that Mr. Coleman failed to protect Ms. Davis' interests on termination of his representation in violation of Rule 4–1.16(d). The panel also found there was no evidence Mr. Coleman commingled client funds with his own funds in violation of Rule 4–1.15, the rule requiring the safekeeping of client property. However, the panel did determine that Mr. Coleman violated Rule 4–1.2(a), by accepting the settlement offer in the Western Missouri Mental Health Center case despite Ms. Davis' expressed wishes. This conduct also violated Rule 4–8.4(d), regarding conduct prejudicial to the administration of justice. The panel recommended that Mr. Coleman be reprimanded publicly. OCDC filed its rejection of the panel's recommendation, which brings the matter before this Court.[4]

OCDC argues that the evidence proves that Mr. Coleman violated the following rules of professional conduct:

(1) 4–1.2, Scope of Representation, in that Mr. Coleman accepted a settlement agreement with Western Missouri Mental Health Center without consent of his client, Ms. Davis, and then moved the court to enforce the agreement despite Ms. Davis' decision not settle;

(2) 4–1.5, Fees, in that Mr. Coleman converted an hourly fee agreement into a contingent fee agreement and did not give Ms. Davis credit for the more than $30,000 in fees she had paid;

(3) 4–1.7, Conflict of Interest: Current Clients, in that Mr. Coleman entered into a contingent fee agreement with Ms. Davis that purported to give him the exclusive right to settle all of her cases and subsequently took action

4. OCDC does not challenge the panel's finding that Mr. Coleman did not violate the rules

of professional conduct in his representation of his other client.

in court despite Ms. Davis' explicit refusal to settle;

(4) 4–1.16, Declining or Terminating Representation, in that Mr. Coleman failed to notify Ms. Davis that he had withdrawn as her counsel and failed to provide Ms. Davis with information regarding her rights and obligations;

(5) 4–1.15, Safekeeping Property, in that Mr. Coleman regularly commingled personal and client funds; and

(6) 4–8.4(d), Conduct Prejudicial to the Administration of Justice, in that Mr. Coleman caused harm to the judicial system and his clients by violating multiple rules of professional conduct.

OCDC requests that this Court suspend Mr. Coleman's license, with no leave to reapply for a period of one year.

### Standard of Review

"Professional misconduct must be proven by a preponderance of the evidence before discipline will be imposed." *In re Crews,* 159 S.W.3d 355, 358 (Mo. banc 2005). This Court reviews the evidence *de novo,* independently determines all issues pertaining to credibility of witnesses and the weight of the evidence, and draws its own conclusions of law. *In re Belz,* 258 S.W.3d 38, 41 (Mo. banc 2008). This Court treats the panel's findings of fact, conclusions of law, and the recommendations as advisory. *In re Crews,* 159 S.W.3d at 358. Moreover, this Court may reject any or all of the panel's recommendations. *In re Madison,* 282 S.W.3d 350, 352 (Mo. banc 2009).

### Discussion

Many of the facts essential to resolve Mr. Coleman's alleged disciplinary rule violations are not contested. Mr. Coleman admits that he drafted three contingent fee agreements for Ms. Davis to sign that purported to give him sole authority to settle her three lawsuits. He admits that he agreed to settle her case against Western Missouri Mental Health Center for $20,000, even though she expressly told him that she did not agree that the case should be settled for that amount. He also admits that he filed a motion in federal district court seeking enforcement of the agreement and proceeded on his motion.

Mr. Coleman does not dispute that, after the court overruled his motion, he filed a motion to withdraw as counsel and did not mail a copy of the motion to Ms. Davis. He admits receiving a letter on April 5, 2007, from Ms. Davis requesting detailed information about her pending lawsuits and not responding in any way.

Mr. Coleman further admits that he wrote personal checks out of his IOLTA account. The bank records of that account establish that personal checks were written by Mr. Coleman at a time when a client's funds were in the account. These facts are sufficient to establish that Mr. Coleman violated Rules 4–1.2, 4–1.7, 4–1.15, 4–1.16, and 4–8.4.

### Violation of Rule 4–1.2

Rule 4–1.2(a) requires a lawyer to accept and adhere to the client's decision whether to accept an offer of settlement of a matter:

(a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d) and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter.

This rule recognizes that fundamental to the attorney-client relationship is the concept that an attorney advocates for the client's objectives. "The client-lawyer relationship itself implies some decisions

[are] reserved to the client. Thus, a client and lawyer could not enter into a valid contract that only the lawyer would have the authority to decide what would benefit the client[.]" Rest. of Law Governing Lawyers § 22 cmt. a (2000). Settlement decisions have the potential both to benefit and harm the client. Rule 4–1.2(a) requires a client to be in control of the decisions that have the capacity to affect the client profoundly, specifically referencing the decision whether to accept a settlement of the case, so an attorney may not execute a contract that gives the attorney the sole right to settle a case.[5]

For the three cases in which he represented Ms. Davis, Mr. Coleman drafted contingent fee contracts that included a provision that "[he] shall have the exclusive right to determine when and for how much to settle this case." He executed the three agreements with this provision and then had Ms. Davis execute them as well. This expressly is disallowed by Rule 4–1.2(a). While Rule 4–1.2(c) allows an attorney to *limit* the scope of representation,[6] the rules of professional conduct do not allow an attorney to *expand* the scope of representation by a client's agreement so that the attorney may determine whether to accept or reject a settlement offer instead of the decision being made by the client.

Mr. Coleman also violated Rule 4–1.2(a) when he acted under the authority of the invalid agreement with Ms. Davis and advised counsel for Western Missouri Mental Health Center that he agreed to settle Ms. Davis' case against the center for $20,000. He agreed to settle Ms. Davis' case after she expressly had told him that she did not accept the $20,000 settlement offer. He further violated Rule 4–1.2(a) when he filed a motion requesting that the court order Western Missouri Mental Health to honor the agreement he accepted despite Ms. Davis' refusal to settle the case. Mr. Coleman's attempt to compel Ms. Davis to settle her case when he knew she did not consent to that settlement expressly is disallowed by Rule 4–1.2(a).

### Violation of Rule 4–1.7

■ Rule 4–1.7(b) provides that "a lawyer shall not represent a client if the representation of that client may be materially limited ... by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected and (2) the client

---

**5.** In addition to violating the rules of professional conduct, fee agreements that purport to give an attorney control over settlement of the case have not been enforced by the courts of other jurisdictions that, like Missouri, have adopted the ABA Model Rules of Professional Conduct. *E.g. Parents Against Drunk Drivers v. Graystone Pines Homeowners' Ass'n,* 789 P.2d 52, 55 (Utah Ct.App.1990) (declaring that fee agreements that give attorneys control over the settlement of the case is contrary to the Utah Code of Professional Responsibility, contrary to public policy and, ultimately, void).

**6.** Under Rule 4–1.2(c): "A lawyer may limit the scope of representation if the client consents after consultation." The comment to Rule 4–1.2 expressly provides that the attor-

ney may not ask the client to surrender the right to settle litigation that the attorney may want to continue:

> The objectives or scope of services provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client.

> \* \* \*

> An agreement concerning the scope of representation must accord with the Rules of Professional Conduct and other law. Thus, the client may not be asked to agree to representation so limited in scope as to violate Rule 4–1.1, or to surrender the right to terminate the lawyer's services or the right to settle litigation that the lawyer might wish to continue.

consents after consultation." The comment to this rule recognizes that "[l]oyalty ... [is] an essential element in the lawyer's relationship to a client" and that "[t]he lawyer's own interests should not be permitted to have adverse effect on representation of a client." Rule 4–1.7, Comment. Although Rule 4–1.7(b) provides that representation by an attorney is permissible despite a conflict of interest if the client consents after consultation, there is a limitation as to when a client may waive a conflict. The client should not be asked to consent to representation despite the conflict, unless it is reasonable to believe that the conflict will not adversely affect the attorney's representation of the client.

It was not reasonable for Mr. Coleman to believe that his interests would not adversely affect his representation of Ms. Davis under the contingent fee agreement that gave him the sole right to settle her cases. Under the contingent fee agreement, Mr. Coleman would receive a contingent fee only if Ms. Davis settled her cases or received a favorable verdict. At the same time, he improperly contracted with her for the exclusive right to settle her cases with or without her consent. The conflict of interest the agreement created was apparent by Mr. Coleman's inclusion of a statement in the agreement indicating his intent was to protect his financial interests rather than her legal interests: "[Y]ou agree I shall have the exclusive right to determine when and for how much to settle this case. That way, I am not held hostage to an agreement I disagree with."

The contingent fee contract gave Mr. Coleman a motivation to protect his financial interests. By divesting Ms. Davis of settlement authority, Mr. Coleman attempted to protect his financial interests by allowing Mr. Coleman to give his interests greater priority than Ms. Davis'. In

doing so, this agreement creates a conflict between Ms. Davis' interests and Mr. Coleman's personal, financial interests. Additionally, Mr. Coleman mailed the agreements to Ms. Davis and never discussed with her the provisions that gave him the sole right to settle her cases.

Mr. Coleman again violated Rule 4–1.7 by acting against Ms. Davis' interests when he advised counsel for Western Missouri Mental Health Center that he would settle Ms. Davis' lawsuit for $20,000, despite her explicit refusal to accept the settlement. Mr. Coleman further acted against her interest, in violation of Rule 4–1.7, by filing a motion in the federal lawsuit asking the court to enforce the agreement despite Ms. Davis' explicit refusal to settle, and by proceeding on the motion. In each of these instances, Mr. Coleman promoted his personal interests when he knew they directly conflicted with those of Ms. Davis.

If a conflict of interest arises after representation is undertaken, a lawyer may be able to protect his client's interests by withdrawing from representation. Rule 4–1.7, Comment. While Mr. Coleman withdrew from his representation of Ms. Davis in her three cases, he did not seek to withdraw at the time it became apparent that his interest was adverse to hers. He withdrew only after the federal court overruled his motion to enforce the agreement against her in the Western Missouri Mental Health Center case. His withdrawal was untimely, and it did not mitigate the conflict. This Court finds that Mr. Coleman violated Rule 4–1.7.

### Violation of Rule 4–1.15

■ Rule 4–1.15(c) states: "A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Client or

third party funds shall be kept in a separate account[.]" [7] Mr. Coleman violated this rule. He admits that, from January to July 2008, he regularly deposited settlement proceeds into his IOLTA account for the purpose of allowing the settlement checks to clear. Mr. Coleman acknowledges that, after each check cleared, he paid the client the client's portion of the settlement. He then regularly paid personal obligations out of his portion of settlement proceeds that remained in his IOLTA account. Mr. Coleman argues this was not a violation of Rule 4–1.15 because "there are no other funds in his IOLTA account, except [Mr. Coleman's]." Mr. Coleman misunderstands Rule 4–1.15(c). Rule 4–1.15(c) explicitly states that there must be an account for client and third-party funds that is kept separate from any account holding an attorney's own funds. While it may be true that Mr. Coleman did not misuse funds by using client funds to pay personal bills or convert any client funds, he did use his IOLTA account for personal use.[8] That is strictly prohibited. Rule 4–1.15, Comment 1.

Commingling personal and client funds is only "permissible when necessary to pay bank service charges on [the IOLTA] account." Rule 4–1.15, Comment 2. Any funds owed to Mr. Coleman should have been transferred into a personal account before the money was withdrawn via a check. Contrary to Mr. Coleman's argument that there were never client funds in the account when he wrote personal checks, records from his bank show that, during the time he kept his personal funds in the IOLTA account and wrote personal checks to expend the funds, there were client funds in the account. This is a classic example of prohibited commingling of attorney and client funds.

Additionally, "accurate records must be kept regarding which part of the funds is the lawyer's." Rule 4–1.15, Comment 2. When questioned about the identity of the owner of specific deposits, Mr. Coleman was unable to say to whom the money belonged.

### Violation of Rule 4–1.16

◼ OCDC also argues the evidence proves that Mr. Coleman violated Rule 4–1.16 because he failed to protect Ms. Davis' interests at the termination of his representation. Specifically, OCDC claims Mr. Coleman did not notify Ms. Davis that he filed motions to withdraw in her cases and did not provide her with information regarding her rights and obligations even though she made a written request for information.

Rule 4–1.16(d) provides that, "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel[.]" One step necessary to protect a client's interest is giving notice to the client that the attorney has filed a motion to withdraw as counsel of record. That notice should be given unless it reasonably cannot be done, such as when client has no known address.

After Mr. Coleman was unsuccessful in enforcing the provision giving him the sole right to settle Ms. Davis' Western Missouri Mental Health Center case, Mr. Coleman filed motions to withdraw as counsel in all three of her cases. The

---

7. The version of Rule 4–1.15 in the 2008 Missouri Rules of Professional Conduct governs. This version was in effect from January 1, 2008, to July 1, 2008.

8. OCDC never alleged that Mr. Coleman converted any client funds.

three motions to withdraw filed by Mr. Coleman included certificates of service, indicating that notice of each motion to withdraw was given by mailing a copy of the motion. The certificates of service do not show that Ms. Davis was mailed a copy.

Mr. Coleman did send her a letter advising her that, in light of their conflict over whether the Western Missouri Mental Health Center case should be settled for $20,000, he needed to know whether he was still representing her in that case and her other two cases. He stated that, unless he heard from her in writing within one week, he would file a motion to withdraw in the Western Missouri Mental Health Center case. She did not respond to his inquiry as he requested, so Mr. Coleman filed a motion to withdraw as counsel in that case on February 28, 2007. It was reasonable for Mr. Coleman to believe that Ms. Davis should know that her failure to respond to his request for communication would result in him filing a motion to withdraw as counsel. Nevertheless, he had an obligation to protect her interest by giving her notice that he actually had filed a motion to withdraw as counsel of record in all three of her cases.

Mr. Coleman further violated rule 4–1.16 by failing to take all reasonable steps to mitigate the consequence of his withdrawal on Ms. Davis, and to protect her interests by providing her with the information she requested. After Ms. Davis learned that Mr. Coleman had filed a motion to withdraw in the Western Missouri Mental Health Center case, she sent Mr. Coleman a letter requesting information that would help her decide whether to object to his withdrawal. In the letter, she asked him

when her federal lawsuit would be set for trial, whether she would need another lawyer, what problems there would be, and whether any offer had been made other than the $20,000 offer that she declined. She asked what fees she owed and requested an itemized statement of all charges and work done to support the charges. She also asked him questions about the status of her two discrimination cases, for a copy of her fee agreement in the Two Rivers case, for itemized statements of the work done, and for Mr. Coleman's charges in both cases. She asked whether he believed he was entitled to a portion of any recovery in the cases and whether he intended to file liens for his fees. Ms. Davis requested that his response be in writing.

At the time that Ms. Davis sent her letter requesting information from Mr. Coleman, she had picked up all of her files from his office. Although she later disputes that her act communicated a decision to terminate Mr. Coleman as her attorney, Mr. Coleman was reasonable in interpreting her action as a termination of his representation. Even so, under Rule 4–1.16, Mr. Coleman was required to protect Ms. Davis' interests on termination of his representation, if reasonably practicable.

Most of the information she requested was vital to her ability to hire counsel to represent her in the three pending cases.[9] While she had possession of her case files at the time she requested information from Mr. Coleman, an attorney considering whether to represent her would be aided greatly by a statement from the prior attorney of record as to the status of her cases. Additionally, any attorney asked to undertake representation in plaintiff's

9. Mr. Coleman does not assert that it was not reasonably practicable to respond to Ms. Davis' inquiries or object to the information requested. Nor does he claim that he was unable to respond to her request because she stated she needed his reply within one day. While it was not practicable for him to respond in one day, he never responded at all.

pending cases would be concerned about receiving payment for services rendered. Whether Mr. Coleman was claiming a percentage of any recovery and whether he intended to file attorney liens were major considerations in any attorney's decision whether to represent Ms. Davis, because she no longer had the ability to pay an hourly rate.

Mr. Coleman was mistaken that he did not have an obligation to give Ms. Davis information about her cases because she had terminated their attorney-client relationship. Mr. Coleman's duty to provide the information arose because of the termination of their relationship. Mr. Coleman violated Rule 4–1.16 by failing to protect Ms. Davis' interests when he did not provide information that was readily within his knowledge and possession.

### Violation of Rule 4–8.4

Rule 4–8.4 defines professional misconduct for which an attorney may be disciplined. Rule 4–8.4(a) states that "[i]t is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct." Rule 4–8.4(d) also provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." By violating rules of professional conduct, Mr. Coleman "has necessarily violated Rule 4–8.4(a)." *In re Caranchini*, 956 S.W.2d 910, 916 (Mo. banc 1997).

OCDC asks this Court to find that Mr. Coleman also violated Rule 4–8.4(d) because his conduct in violation of the rules of professional conduct wasted judicial resources and negatively impacted the judicial process so it was prejudicial to the administration of justice. Regarding Rule 4–8.4(d), Mr. Coleman wasted judicial resources when he filed a motion and attempted to enforce a prohibited agreement purporting to give him the sole right to settle Ms. Davis' case. His conduct also negatively impacted the judicial process because his failure to give Ms. Davis information at the termination of his representation hindered her ability to obtain new counsel that was necessary to adjudicate her claims in the pending cases. Mr. Coleman, therefore, violated Rule 4–8.4(d).

### Insufficient Evidence of Violation of Rule 4–1.5

OCDC asserts that Mr. Coleman violated an additional rule of professional conduct, Rule 4–1.5, by making agreements with Ms. Davis for unreasonable fees. Despite the fact that Mr. Coleman can produce no written records or accountings to show the work he performed, OCDC does not contend the $30,000 to $50,000 in fees that he charged and that Ms. Davis paid were unreasonable. Instead, OCDC asserts that Mr. Coleman's conversion of his agreements for a $200 hourly fee to contingent fee agreements where Mr. Coleman would receive 30 percent of any recovery was *per se* unreasonable because Ms. Davis received no credit for the $38,000 in fees she already had paid in her three cases. Additionally, OCDC notes that, at the time Ms. Davis was asked to consent to the contingent fee agreement, she had invested five years in Mr. Coleman's representation with no resolution in any of her actions. OCDC suggests that she had little choice but to agree because her financial resources had been depleted.

This Court is concerned there are no records to document the work Mr. Coleman did for Ms. Davis, the amount he billed her for his work, or the expenses he incurred on her behalf. Mr. Coleman claims that he gave all his records to Ms. Davis, except possibly tax records, and did not keep copies for himself. While not keeping copies of records is ill-advised,

there is nothing in the record to dispute his claim.[10]

Importantly, there was evidence that Mr. Coleman spent significant time and effort on Ms. Davis' behalf. Although Ms. Davis paid Mr. Coleman $38,000, a large sum of money, his work was on three lawsuits spanning five years. All three lawsuits involved complex legal issues: they were a medical malpractice wrongful death suit and two discrimination lawsuits. He communicated with her on a regular basis, updated her about the status of the cases, and provided her copies of documents he filed and received in the court proceedings. Mr. Coleman consulted two doctors and hired one as an expert in the wrongful death case. A portion of the amount Ms. Davis paid Mr. Coleman was for litigation expenses, including fees for the two doctors. Finally, the percentage that Mr. Coleman agreed to accept under the contingent fee agreement was 30 percent, which is on the lower end of contingent fee percentages, and that percentage was applicable even if the case was tried. The disciplinary hearing panel found that the evidence was insufficient to show Mr. Coleman violated Rule 4–1.5, and this Court agrees.

### Appropriate Discipline

 Having found by a preponderance of the evidence that Mr. Coleman committed multiple acts of professional misconduct, this Court now turns to the appropriate discipline to impose. "The fundamental purpose of an attorney disciplinary proceeding is to 'protect the public and maintain the integrity of the legal profession.'" *Crews*, 159 S.W.3d at 360 (quoting *In re Waldron*, 790 S.W.2d 456, 457 (Mo. banc 1990)). This Court relies on the ABA Standards when imposing sanctions to achieve the goals of attorney discipline. *In re Storment*, 873 S.W.2d 227, 231 (Mo. banc 1994). The goals of attorney discipline are to protect the public, ensure the administration of justice, and maintain the integrity of the profession. ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS 6 (1992). Under the ABA Standards, the factors considered are the ethical duty and to whom it is owed, the attorney's mental state, the amount of injury caused by the attorney's misconduct, and, finally, any aggravating or mitigating circumstances. ABA STANDARDS at 7.

Ethical duties are owed to the client, the public, the legal system, and the profession. Of the duties that are relevant to Mr. Coleman's violations, the duties owed to the client include the duty to preserve the client's property, Rule 4–1.15, and the duty to avoid conflicts of interest, Rule 4–1.7. The duties owed to the public are protected in part by Rule 8.4, attorney misconduct. This rule helps guarantee that the public can trust lawyers to protect their interests and property. The duties owed to the legal system and the legal profession helps to ensure that the administration of justice is swift and accurate. Rules 4–8.4, attorney misconduct, and 4–1.16, declining or terminating representation, work to protect these interests.

The ABA's next factor to examine when calculating sanctions is the attorney's mental state while committing the rule violation. The ABA Standards use three mental states: intent, knowledge, and neg-

---

**10.** When Mr. Coleman gave Ms. Davis her case files and billing records, he did not make and keep copies for his own records. While duplicate records are not required by the rules of professional conduct, the amended version of Rule 4–1.15(c) does require that a lawyer preserve "complete records" of a client's trust account for five years. Because a client generally requests his or her files only when problems have arisen in the attorney-client relationship, however, this case demonstrates why retaining such records is prudent.

ligence. Intent, the most culpable mental state, is displayed when "a lawyer acts with the conscious objective or purpose to accomplish a particular result." *Id.* at 10. Knowledge is shown when "the lawyer acted with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result." *Id.* The least culpable mental state is negligence, exhibited when "a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Id.*

When discussing injury to the client, the ABA Standards look at the actual injury to the client as well as the potential injury to the client, public, and legal system or profession that is "reasonably foreseeable at the time of the lawyer's misconduct." *Id.* at 13. The level of injury ranges from "serious" to "little or no" injury.

Finally, the last inquiry in the ABA Standards considers aggravating and mitigating factors. Aggravating factors, which increase the severity of the sanction, include prior discipline by the disciplinary committee or vulnerability of the client. *Id.* at 11. Mitigating factors, which decrease the severity of the sanction, include inexperience in the practice of law, remorse, character and reputation, and absence of a selfish motive. *Id.* at 11, 28. When multiple charges of misconduct are found, "the ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among the violations." *Id.* at 12.

Applying these factors to Mr. Coleman, OCDC asserts that the most serious instances of misconduct involve Mr. Coleman failing to follow his client's directives, creating a conflict of interest, and

mishandling client funds. Mr. Coleman's failure to follow Ms. Davis' directive in violation of Rule 4–1.2 is governed by ABA Standard 4.4, which provides that suspension is appropriate when a lawyer knowingly fails to perform services for a client and causes injury or potential injury. Reprimand is appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client. Despite the plain language of Rule 4–1.2 requiring that the client make any decision regarding settlement, Mr. Coleman knowingly had his client execute an agreement where he was given the sole authority to settle his client's cases. While Mr. Coleman did not intend to violate the rules of professional conduct and is reluctant to accept that his actions are improper and prohibited, he knowingly failed to abide by his client's directive to reject the state's settlement offer by not only advising the state that the settlement offer was accepted but also filing a motion to enforce the settlement agreement. Likewise, Mr. Coleman's conduct in violating Rule 4–1.7, creating a conflict of interest, and Rule 4–1.15, safekeeping of client property, was knowing conduct.

With regard to the injury to Ms. Davis from these violations, she was required to take action to protest Mr. Coleman's efforts to enforce his settlement with Western Missouri Mental Health Center. Additionally, the improper agreement contributed to the deterioration of her relationship with Mr. Coleman, which left her without counsel in all three cases and led to the dismissal of her case against Western Missouri Mental Health Center.

As to aggravating circumstances, this Court admonished Mr. Coleman in 1990 and 1999, and publicly reprimanded him 2008. The applicable

---

mitigating factor is the absence of dishonest motives.

Applying the ABA standards, the nature of Mr. Coleman's conduct justifies the suspension of Mr. Coleman's license to practice law without leave to reapply for one year. The ABA Standards provide, however, for lesser discipline where the behavior was not intentional. The ABA Standards suggest that probation is the appropriate punishment when the conduct can be corrected and the attorney's right to practice law needs to be monitored or limited rather than revoked. ABA STANDARDS, Rule 2.7 Probation, Commentary. This concept is recognized by this Court's Rule 5.225, which provides:

A lawyer is eligible for probation if he or she:

(1) Is unlikely to harm the public during the period of probation and can be adequately supervised;

(2) Is able to perform legal services and is able to practice law without causing the courts or profession to fall into disrepute; and,

(3) Has not committed acts warranting disbarment.

Mr. Coleman's actions arose out of ignorance of the rules of professional conduct instead of an intention to violate the rules,[11] and it is likely that his misconduct can be remedied by education and supervision. Because this Court finds that Mr. Coleman's violations make him a proper subject for probation, it orders that execution of the suspension of his license to practice law be stayed and that he be placed on probation for one year. The conditions of his probation shall include attendance at the ethics school conducted by OCDC, participation in law practice management education and mentoring, preparation of an office management plan that is approved by OCDC, filing of quarterly responsibility reports, submission to periodic financial audits, employment of a qualified consultant, maintenance of adequate trust account records, and commission of no other violations of the rules of professional conduct.

### Conclusion

Mr. Coleman is ordered suspended from the practice of law without leave to reapply for one year. The execution of his suspension is stayed, and Mr. Coleman is placed on probation for a period of one year, with terms of his probation as imposed herein.

All concur.

---

11. It is unlikely that Mr. Coleman would have filed a motion in court in an attempt to enforce the settlement agreement against the Western Missouri Mental Health Center despite Ms. Davis' explicit refusal to settle, if he knew such an agreement violated the rules of professional conduct. Likewise, it is unlikely that Mr. Coleman would have written a check on his IOLTA account to pay his fees and costs in his previous disciplinary proceeding if he had known that doing so violated the rules of professional conduct.