

# SUPREME COURT OF MISSOURI
## en banc

IN RE: JOEL B. EISENSTEIN,         )
                                        )      No. SC95331
                      Respondent.      )

ORIGINAL DISCIPLINARY PROCEEDING

*Opinion issued April 5, 2016*

The Office of Chief Disciplinary Counsel (OCDC) filed an information charging Joel Eisenstein with several violations of the Rules of Professional Responsibility. A disciplinary hearing panel (DHP) found that Mr. Eisenstein violated Rules 4-8.4(c), 4-8.4(d), 4-3.4(a) and 4-4.4(a) by using illegally obtained evidence, including the work product of opposing counsel. The DHP recommended an indefinite suspension with no leave to apply for reinstatement for 12 months. Mr. Eisenstein rejected the recommended discipline. This Court finds that Mr. Eisenstein violated the rules as determined by the DHP and orders that he be suspended indefinitely with no leave to reapply for reinstatement for six months.

### Facts

Mr. Eisenstein was licensed as an attorney in Missouri in 1974. Mr. Eisenstein's license has been disciplined on five prior occasions. In 1991 and again in 1999, Mr. Eisenstein was admonished for violating Rule 4-3.5(b) by engaging in ex parte communications with the judge. In 1997, this Court suspended Mr. Eisenstein after he

pleaded guilty to a federal misdemeanor for willfully failing to file an income tax return. In 2001, Mr. Eisenstein was admonished for violating Rule 4-8.1(b) by failing to respond to the OCDC's request for information regarding an ethics complaint. Finally, in 2004, Mr. Eisenstein was admonished for violating Rule 4-3.3(d) for failing to inform the court of material facts relevant to a pending issue.

The present disciplinary matter involves Mr. Eisenstein's representation of his client (Husband) in an action to dissolve Husband's marriage to Wife. Attorney Stephanie Jones represented Wife. On multiple occasions, Husband accessed Wife's personal e-mail account without her permission. Mr. Husband obtained Wife's most current payroll documents and a list of direct examination questions Ms. Jones had e-mailed to Wife in preparation for trial. In November 2013, Husband delivered the payroll documents and list of direct examination questions to Mr. Eisenstein.

On February 11, 2014, the second day of trial, Mr. Eisenstein handed Ms. Jones a stack of exhibits that included Ms. Jones' direct examination questions. Prior to this time, neither Ms. Jones nor Wife was aware that Husband had improperly accessed Wife's e-mail account and delivered the information to Mr. Eisenstein. Ms. Jones requested a conference with the trial judge and a hearing on the record.

At the hearing, Husband admitted that he improperly accessed Wife's personal e-mail account and obtained the list of direct examination questions and the payroll information. Husband admitted that he made notes on the list and delivered the documents to Mr. Eisenstein.

Ms. Jones also questioned Mr. Eisenstein on the record. Mr. Eisenstein admitted that he had viewed the information improperly obtained by Husband and that he did not immediately disclose his receipt of this information to Ms. Jones:

Q. And you said you were going to object to all of my leading questions that are contained in the outline?

A. Well I was teasing you, counsel, I haven't read –

Q. Did you say that or not?

A. I teasingly said that to you, yes I did.
Q. So you said that?

A. I told you that I had read the – that at some point in time I had read the first portion of that and realized that it was verboten, it was something that I should not have.

Q. But you never came to me and said I have your outline, however, you came to be in possession of it, did you?

A. No, I didn't counsel. I handed it to you this morning.

Q. Thank you.

On February 14, 2014, Mr. Eisenstein sent the following e-mail to Ms. Jones:

Rumor has it that you are quite the gossip regarding our little spat in court. Be careful what you say. I'm not someone you really want to make a lifelong enemy of, even though you are off to a pretty good start. Joel.

The OCDC filed an Information charging Mr. Eisenstein with violating Rules 4-4.4(a) for using methods of obtaining evidence in violation of the rights of a third person; 4-8.4(c) and (d) for reviewing and using improperly obtained evidence; 4-3.4(a) for unlawfully concealing a document having evidentiary value; and 4-3.3(a) for misrepresenting facts to a tribunal. The DHP held a hearing and determined that

3

Mr. Eisenstein violated Rules 4-4.4(a), 4-8.4(c) and (d), and 4-3.4(a). In addition to possessing Ms. Jones' direct examination questions, the DHP also found, based on Ms. Jones' testimony, that Mr. Eisenstein had used the improperly obtained payroll information during a pre-trial settlement conference. The DHP recommended an indefinite suspension with no leave to apply for reinstatement for 12 months. Mr. Eisenstein rejected this recommendation. This Court has jurisdiction pursuant to its inherent power to regulate the practice of law.

## Standard of Review

The DHP's findings of fact, conclusions of law, and recommendations are advisory, and this Court may reject any or all of the DHP's recommendations. *In re Coleman*, 295 S.W.3d 857, 863 (Mo. banc 2009). "Professional misconduct must be proven by a preponderance of the evidence before discipline will be imposed." *In re Farris*, 472 S.W.3d 549, 557 (Mo. banc 2015). "This Court decides the facts *de novo*, 'independently determining all issues pertaining to credibility of witnesses and the weight of the evidence, and draws its own conclusions of law.'" *Id.*, quoting *In re Snyder*, 35 S.W.3d 380, 382 (Mo. banc 2000).

## Rule 4-4.4(a)

The information alleged that Mr. Eisenstein violated Rule 4-4.4(a) by utilizing the payroll information and list of direct examination questions that were improperly procured by Husband. Rule 4-4.4(a) prohibits a lawyer from using "methods of obtaining evidence that violate the legal rights" of a third party. Comment 1 to Rule 4-4.4(a)

4

specifically notes that the rule is intended to prevent "unwarranted intrusions into privileged relationships, such as the client-lawyer relationship."

The preponderance of the evidence supports a finding that Mr. Eisenstein violated Rule 4-4.4(a). Ms. Jones testified credibly that Mr. Eisenstein had referenced information from Wife's payroll documents during pretrial settlement negotiations. Further, Mr. Eisenstein admitted that he reviewed the information provided by Husband, realized it was "verboten," and did not immediately disclose his receipt of the information to opposing counsel. Mr. Eisenstein's failure to promptly disclose his receipt of the information and return it to Ms. Jones until after the trial had commenced supports a finding that Mr. Eisenstein utilized Husband's improper acquisition of Wife's personal information, including privileged attorney client communications.

Mr. Eisenstein argues that he did not use improper means to obtain the evidence because it was Husband who obtained the information. The fact that Husband obtained the information does not negate the fact that Mr. Eisenstein received the information, realized it was "verboten," and then failed to disclose his receipt of that information until the second day of trial. The comment accompanying Rule 4-4.4(a) recognizes that lawyers "sometimes receive documents that were mistakenly sent or procured by opposing parties or lawyers." However, when a lawyer knows that he or she has improperly received information, "Rule 4-4.4 requires the lawyer to promptly notify the sender in order to permit that person to take protective measures." In this case, Rule 4-4.4 required Mr. Eisenstein to promptly disclose his receipt of the information to

5

Ms. Jones so that appropriate protective measures could be undertaken. Mr. Eisenstein did not do so.

Mr. Eisenstein also argues that he immediately disclosed his receipt of the information. Mr. Eisenstein asserts that when he testified in chambers that he had realized "at some point in time" that the information was "verboten," he was explaining that he had just realized that the information was improperly obtained. If Mr. Eisenstein had just discovered the source of the information minutes before his in-chambers testimony, he could have so stated. The DHP did not find Mr. Eisenstein's explanation credible and neither does this Court. Mr. Eisenstein violated Rule 4-4.4(a).

### Rule 4-8.4(c)

Rule 4-8.4(c) prohibits a lawyer from engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation." Mr. Eisenstein's violation of Rule 4-4.4(a) by obtaining evidence procured through improper means and failing to immediately disclose the same to opposing counsel demonstrates a violation of Rule 4-8.4(c).

### Rule 4-3.4(a)

Rule 4-3.4(a) provides, in part, that a lawyer shall not "unlawfully obstruct another party's access to evidence or unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value." Mr. Eisenstein violated Rule 4-3.4(a) by concealing his possession of Wife's payroll information and Ms. Jones' direct examination questions until the second day of trial.

## Rule 4-8.4(d)

The information alleged that Mr. Eisenstein violated Rule 4-8.4(d) by sending a threatening e-mail to Ms. Jones. Rule 4-8.4(d) prohibits a lawyer from engaging "in conduct that is prejudicial to the administration of justice." Mr. Eisenstein's e-mail to Ms. Jones clearly implied that Ms. Jones would suffer professional retribution if she further discussed the issue. Threatening opposing counsel during the course of litigation or to avoid an ethics complaint constitutes conduct prejudicial to the administration of justice. Mr. Eisenstein's conduct violated Rule 4-8.4(d).

## Suspension is the Appropriate Discipline

The purpose of attorney disciplinary proceedings is "to protect the public and maintain the integrity of the legal profession." *In re Ehler*, 319 S.W.3d 442, 451 (Mo. banc 2010). When imposing discipline, this Court considers the ethical duty violated, the lawyer's mental state, the extent of actual or potential injury caused by the attorney's misconduct, and any aggravating or mitigation factors. *Id.* The ABA Standards for Imposing Lawyer Sanctions (1991) provide guidance for assessing the appropriate discipline. *Id.* at 451-52.

ABA Standard 6.12 provides that "suspension is generally appropriate when a lawyer knows that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding." ABA Standards 6.1 and 6.12 provide that suspension is appropriate when the case involves "conduct that is

7

prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to the court." *In re Madison*, 282 S.W.3d 350, 361 (Mo. banc 2009).

According to the ABA Standards, "knowledge" is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result. ABA Standards Definitions, p. 17. Mr. Eisenstein admitted that he reviewed the information and concluded that it was "verboten." Yet Mr. Eisenstein did not disclose his discovery of the improper evidence to Ms. Jones. Mr. Eisenstein's recognition that he should not have possession of the information and his decision to not disclose his receipt of that information demonstrate that he acted knowingly. Mr. Eisenstein's retention and use of the improperly obtained evidence warrants a suspension.

Although suspension is the presumptive discipline, the Court must consider mitigating and aggravating circumstances before determining whether to depart from this discipline in a particular case. *In re Belz*, 258 S.W.3d at 42. Mitigating factors do not constitute a defense to a finding of misconduct but may justify a downward departure from the presumptively proper discipline. *Ehler*, 319 S.W.3d at 452. Similarly, aggravating circumstances may justify a level of discipline greater than the presumed discipline or confirm that the presumed discipline is appropriate for the particular case.

Mr. Eisenstein asserts that any discipline should be mitigated by his lack of a dishonest or selfish motive. The ABA Standards indicate that a suspension is warranted where the lawyer knowingly and improperly withholds information. The lack of a dishonest or selfish motive is not dispositive. As established, the preponderance of the

8

evidence demonstrates that Mr. Eisenstein knowingly retained the improperly obtained evidence and did not promptly disclose his receipt of that information so that protective measures could be employed.

Mr. Eisenstein also asserts that he suffers from post-traumatic distress syndrome due to his military service in Vietnam. Mr. Eisenstein does not elaborate on how this past military service in any way excuses the professional misconduct in this case. There are no mitigating factors.

Mr. Eisenstein's four prior admonitions and previous suspension are aggravating factors. Mr. Eisenstein's prior disciplinary history, considered with the violations in this case, warrant a suspension with no leave to apply for reinstatement for six months.

### Conclusion

Mr. Eisenstein is suspended indefinitely with no leave to reapply for six months. Reinstatement will be conditioned on meeting the requirements for readmission set out in this Court's rules.

_____
Richard B. Teitelman, Judge

Breckenridge, C.J., Stith, Draper and
Russell, JJ., concur; Fischer, J., dissents
in separate opinion filed; Wilson, J.,
concurs in opinion of Fischer, J.;
Wilson, J., dissents in separate opinion
filed; Fischer, J., concurs in opinion of
Wilson, J.



# SUPREME COURT OF MISSOURI
## en banc

IN RE: JOEL B. EISENSTEIN,       )
                                      )      No. SC95331
                  Respondent.      )

### DISSENTING OPINION

I respectfully dissent. I agree with the principal opinion that Eisenstein has violated Rules 4-4.4(a), 4-8.4(c), 4-3.4(a), and 4-8.4(d), and that Eisenstein should be suspended indefinitely. However, in my view, Eisenstein should be suspended indefinitely with no leave to apply for reinstatement for 12 months, rather than 6 months.[1]

As noted in the principal opinion, this Court has sought guidance from the ABA Standards for Imposing Lawyer Sanctions. *See, e.g., In re Coleman*, 295 S.W.3d 857, 869 (Mo. banc 2009). The principal opinion correctly concludes that Eisenstein's misconduct warrants a suspension under Standards 6.1 and 6.12. Under the ABA Standards, six months is the minimum period of time that a suspension should last before an attorney is allowed to seek reinstatement. ABA Standard 2.3. That is, the recommended baseline discipline for misconduct warranting a suspension is a suspension with no leave to apply for reinstatement for six months. *Id.* Under Standard 9.1, an adjustment to the baseline discipline may then be justified by the presence of aggravating or mitigating factors.

---

[1] I also agree with Judge Wilson's dissenting opinion that it was inappropriate for Eisenstein to solicit letters of support in an effort to influence this Court, and that such letters were not part of the record before this Court.

Despite purporting to consider aggravating and mitigating factors, and further finding there are no mitigating factors in this case but only aggravating factors, the principal opinion still concludes the baseline discipline is appropriate. This creates a noticeable disconnect between the principal opinion's purported process and its ultimate conclusion. While there are no mitigating factors in this case, there are indeed *numerous* aggravating factors present that justify an upward deviation from the baseline discipline, including: (1) prior disciplinary offenses; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple offenses; (5) refusal to acknowledge the wrongful nature of his conduct; and (6) substantial experience in the practice of law. *See* Standards 9.22, 9.32. There were multiple instances of misconduct and multiple rules violations by Eisenstein in this case alone, and Eisenstein, who has continually refused to acknowledge any wrongdoing and even threatened a fellow attorney in an attempt to quiet any accusations of wrongdoing, has already been disciplined five times in the last 25 years, including one suspension. Accordingly, if the lack of mitigating factors and multiplicity of aggravating factors are truly given due consideration, something greater than the baseline discipline is warranted.

More persuasive than the ABA Standards, this Court should be guided by its actions in past disciplinary cases. *In re Stewart*, 342 S.W.3d 307, 310 (Mo. banc 2011). In the past, this Court has not just acknowledged aggravating and mitigating factors, but actually accounted for such factors in deviating from the appropriate baseline discipline. *See, e.g., In re Crews*, 159 S.W.3d 355, 359–61 (Mo. banc 2005) (determining suspension was justified and suspending attorney indefinitely with no leave to apply for reinstatement for one year where there were numerous rule violations and attorney refused to recognize his

2

wrongdoing); *In re Donaho*, 98 S.W.3d 871, 875–76 (Mo. banc 2003) (determining disbarment could be justified, finding suspension appropriate after consideration of mitigating factors, and suspending attorney indefinitely with no leave to apply for reinstatement for 12 months, rather than the 9 months recommended by the OCDC, after consideration of aggravating factors). Moreover, this Court "adheres to a practice of applying progressive discipline when imposing sanctions on attorneys who commit misconduct." *In re Forck*, 418 S.W.3d 437, 444 (Mo. banc 2014); *see also In re Ehler*, 319 S.W.3d 442, 445 (Mo. banc 2010) (disbarring attorney after attorney previously received a six-month stayed suspension with two-year term of probation and then committed further misconduct). Notably, this Court has already once before suspended Eisenstein indefinitely with no leave to apply for reinstatement for six months.

"The goals of attorney discipline are to protect the public, ensure the administration of justice, and maintain the integrity of the profession." *In re Coleman*, 295 S.W.3d at 869. Eisenstein's misconduct in this particular case has been prejudicial to the administration of justice and his continued misconduct denigrates the integrity of the profession. Following the ABA Standards and this Court's past practices, Eisenstein's misconduct certainly warrants a suspension. However, the baseline discipline for misconduct warranting a suspension is simply insufficient when considering the goals of attorney discipline, the aggravating factors in this case, and this Court's previous discipline of Eisenstein. I would, therefore, suspend Eisenstein indefinitely with no leave to apply for reinstatement for 12 months.

_____
Zel M. Fischer, Judge

3



# SUPREME COURT OF MISSOURI
## en banc

IN RE: JOEL B. EISENSTEIN,         )
                                       )      No. SC95331
                    Respondent.      )

## DISSENTING OPINION

I respectfully dissent.  I agree with the discipline recommended by the disciplinary hearing panel ("DHP") for the reasons expressed in Judge Fischer's dissenting opinion. I write separately, however, to address the mistaken impression that it is appropriate for Respondent to solicit communications from members of the bar and judiciary for the purpose of influencing the Court's resolution of this matter.

On September 1, 2015, a copy of the DHP's decision was served on Informant and Respondent.  On September 17, Respondent notified the Advisory Committee that he would not accept the DHP's recommendation.  As a result of this rejection, the matter was set for briefing and argument in this Court.

Five months after the DHP's decision, and barely three weeks before the argument date in this Court, Respondent solicited letters of support from members of the bar and judiciary.  One of these solicitations took the form of an email titled: "I'm too old for this xxxx!!"  [Expletive deleted.]  Included with this email was Respondent's four-page "complete history" of the charges and the DHP decision.  This explanation varies greatly

from the facts found by the DHP five months earlier, misstates that only two of the three members of the DHP found against the Respondent, and concludes by stating that Respondent had "appealed" the matter to this Court and the argument was set for February 24, 2016.

As a result of Respondent's solicitations, thirty-five attorneys and three sitting Missouri judges sent letters to the Office of the Chief Disciplinary Counsel ("OCDC"). None of these letters purport to offer any first-hand knowledge of the facts charged by the OCDC and found by the DHP. Instead, the letters merely attest to Respondent's good character and reputation and laud his service to our country as a combat veteran. On February 25, the day after the matter was argued and submitted to this Court, Respondent's counsel asked the OCDC to forward these letters to this Court. The OCDC complied, submitting the packet of letters to the clerk of this Court under Rule 84.20.

Respondent's letters are not before this Court. They were not presented to the DHP, *see* Rule 5.19(d) (where respondent rejects DHP's decision, the OCDC "shall file in this Court the complete record made before the disciplinary hearing panel"), nor did Respondent move to supplement the record in this Court. Even if Respondent had sought to make these letters part of the record, they likely would not have been admitted because they lack probative value regarding either Respondent's misconduct or the appropriate discipline. This Court has noted:

> Evidence of good character is much more appropriate in regard to assessment of sanctions for discipline where the attorney has admitted to the misdeeds and shows some remorse. It is then helpful to fathom just what sanctions are most likely to preserve the integrity of the profession and protect the public. But where, as here, the accused stands in unbowed

2

opposition to the administration of justice, though the evidence against him is far greater than that required by disciplinary proceedings, and no remorse is shown, evidence of otherwise good character is less of an aid in fashioning sanctions.

Critical to any opinion as to the appropriate sanction is a full knowledge of the conduct alleged and charged. The character witnesses who testified indicated that they were not familiar with the conduct charged in the information.

*In re Frick*, 694 S.W.2d 473, 480 (Mo. banc 1985).

Rather than attempting to include these letters in the record before the DHP or this Court, Respondent's counsel merely requested that the OCDC submit them to the clerk of the Court under Rule 84.20.[1] This does not make them part of the record, and it would no more be appropriate for the Court to consider these letters than if the authors had sent them directly to chambers or called individual judges in an attempt to alter the outcome of this proceeding.

But it is not sufficient merely to note the futility of Respondent's letter-writing campaign. Instead, this Court has made it plain in the past that such letters demonstrate a lack of understanding of the process spelled out in Rule 5 and a lack of respect for the canons of judicial ethics.

In passing we note that in addition to those who testified, one hundred forty-two prominent individuals or couples and 68 lawyers affixed their signatures to instruments denominated to be "amicus curiae briefs,"

---

[1] If letters of support are not presented to the DHP or otherwise made part of the record in this Court, it matters not how they are presented. *See In re Frick*, 694 S.W.2d at 480 n.4 ("In the Application for Reinstatement of Donald M. Witte, (not reported), the Court was bombarded with 37 letters on behalf of the applicant, 19 being from members of the judiciary itself, 8 from lawyers, and 10 from prominent citizens in the area. In *In the Matter of Kohn,* 568 S.W.2d 255 (Mo. banc 1978), 32 letters were offered as an exhibit.").

3

advocating acquittal of or leniency toward respondent. There is no evidence before us that any of these persons were more knowledgeable of the facts surrounding respondent's conduct than the character witnesses previously discussed.

It is unfortunate that recent cases, including this case, indicate that there may be a growing belief that the Missouri judiciary will be responsive to appellate practice techniques much resembling the letter writing bombardments and the petition signing campaigns to which legislative bodies are subjected. We do not believe that the citizens of Missouri either expect or want a judiciary which responds to such practices. Nor do we believe that such practices have a place in the orderly administration of justice under the rule of law. We have no difficulty in understanding and excusing what we believe to be the well-intentioned responses of those who are untrained in the law. *It is no compliment to the Court, however, that there may exist within the profession those who believe that such tactics might influence the decision of the Court. Recognizing that there is an appropriate and legitimate use and function of amicus curiae briefs in our judicial process, we caution all that letter writing bombardments and petition signing campaigns are no part of that process and are not welcomed by the Court.*

*In re Frick*, 694 S.W.2d at 480-81 (emphasis added and footnote omitted).

Accordingly, it bears repeating that the type of letters solicited by Respondent have little utility when properly offered as part of the record and no utility when sent to this Court outside the record after the case has been argued and submitted.

Paul C. Wilson, Judge

4